**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Mark Leroy SPARKS, Defendant–Appellant.**

**No. 99–30389.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 2000

Filed Sept. 7, 2001

Michael S. Taggart, Anchorage, Alaska, for the defendant-appellant.

Stephen Cooper, Office of the U.S. Attorney, Fairbanks, Alaska, for the plaintiff-appellee.

Before: B. FLETCHER and FISHER, Circuit Judges, and SCHWARZER,* District Judge.

BETTY B. FLETCHER, Circuit Judge:

Mark Leroy Sparks was convicted and sentenced following a bench trial. We must decide whether his prior criminal record qualifies him as an Armed Career Criminal. This is contingent on whether either a prior attempted burglary or a theft from storage lockers qualifies as a violent felony under 18 U.S.C. § 924(e). In respect to his current conviction, Sparks claims that the search of the car and his bag violated his Fourth Amendment rights. We affirm in part, reverse in part, and remand for resentencing.

## I.

### A. Facts

Mark Leroy Sparks ("Sparks") was accused of stealing two guns belonging to Raymond Fox ("Fox") in the early morning hours of March 28, 1999. Sparks was indicted on one count of being a felon and a career criminal in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), and on a second count of stealing a firearm, in violation of 18 U.S.C. § 924(l).

The facts read like the plot of a mystery novel. Fox returned to his home in Nenana, Alaska, after spending several hours in a local bar. He discovered that someone had forced open a front window and entered his home. A quick search of the house revealed that a black bag containing two handguns had been taken. A heavy snow was falling, and Fox could see a set of footprints leading across the street to an intersection. The footprints ended there, as the burglar had apparently been picked up by a passing vehicle. The tire marks from a single car could be seen heading north.

Fox returned home, dialed 911, and spoke to Officer Milton J. Haken ("Haken"). When Haken arrived at Fox's house, he found the scene-the window, the footprints, and the tire tracks-as Fox had described it. Fox also informed Haken that he had seen a stranger in the bar, had bought the stranger dinner, and then later had seen the same man successfully hitch a ride with a passerby precisely at the spot where the footprints ended. This stranger, Fox was sure, was the burglar.

Haken asked Fox to accompany him in Haken's car as he followed the tire tracks north, so that if they overtook the hitchhiker, Fox could identify him as the burglar. They followed the tracks on the Parks Highway for fifty miles to the town of Ester, Alaska, on the outskirts of Fairbanks. At Ester, a second set of tire tracks joined the first. Shortly thereafter, one set of tracks turned off the road into the Gold Hill Tesoro service station where a black Ford Explorer was being refueled. As they drove past the station, Fox noticed that the stranger he had seen was kneeling beside the car. Haken immediately turned around and returned to the station, and by that time, the kneeling man had reentered the car; Haken asked the man at the

---

* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

pump whether he had picked up anybody in Nenana. The man said he had, and Haken drew his weapon, opened the car door, and forced the suspect out.

The suspect was later identified as the defendant, Sparks. Haken handcuffed Sparks, and began to search his clothing. While Haken was searching Sparks, he told Fox to look and "see if his stuff was in the vehicle." Fox retrieved a green duffel bag from the car, which he searched. His black bag was inside, and contained the two missing handguns. Haken placed Sparks in his patrol car and took him back to headquarters.

### B. Procedural History

After indictment, Sparks filed a Motion to Suppress Evidence in which he attacked the lawfulness of his arrest and search. The district court, in accordance with the Report and Recommendation of the magistrate judge, denied the motion.

Defendant waived his right to a jury and was tried on stipulated facts. The unresolved issue at trial was whether the government could prove that Sparks had committed at least three prior violent felonies to mandate application of the Armed Career Criminal Act ("ACCA"). After the trial and further briefing, the district court decided that the government had proved three qualifying predicate convictions and thus sentenced Sparks as an Armed Career Criminal to 180 months on count one, and a concurrent 92 month sentence on count two, followed by a five-year period of supervised release.

### II.

■ We have jurisdiction pursuant to 28 U.S.C. § 1291. Whether probable cause supports a warrantless search of an automobile and containers within it are questions of law reviewed de novo. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Motions to suppress are reviewed de novo. *United States v. Wright*, 215 F.3d 1020, 1025 (9th Cir.2000).

■ A trial court's conclusion that a prior conviction may be used for purposes of a sentencing enhancement is reviewed de novo. *United States v. Phillips*, 149 F.3d 1026, 1031 (9th Cir.1998).

### III.

Sparks raises two arguments challenging the legality of the search of the car and his duffel bag: (1) Officer Haken did not have probable cause to search the car; and (2) even if he had probable cause, the manner in which he conducted the search was unreasonable, because he commissioned Fox to carry out the search.

### A. Probable Cause

■ Probable cause is measured by looking at the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (describing the test as involving "a practical, common-sense decision whether, given all the circumstances ... including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place").

■ We conclude Haken had probable cause to arrest Sparks and to search the vehicle and contents within for the stolen guns. The district court judge classified this as a "perfect circumstantial evidence case that Sparks had means, motive and opportunity." The victim, Fox, was able to identify Sparks at every critical stage. He met Sparks at the bar and bought him dinner. He recognized Sparks as the hitchhiker he had seen from across the street and had waved at. He described

what Sparks had been wearing when Officer Haken arrived on the scene to investigate. Finally, he recognized Sparks when he saw him kneeling alongside the car at the gas station as the same person he had met in the bar and had seen hitchhiking.

Fox and Haken tracked the footprints starting from the broken window, crossing the street, to the point where Fox had seen Sparks flag down and enter a passing car. Sparks argues that the footprint evidence was obscured by the footprints that Fox had left while first investigating the scene, but Officer Haken testified that he could make out two, and only two, distinct sets of prints.

Fox and Haken testified that they tracked a lone set of tire tracks, through the freshly fallen snow, most of the way to Ester. Only on the outskirts of town did they encounter another set of tracks. Even though Haken originally drove past the service station, he testified that Fox immediately noticed Sparks near a Ford Explorer, and immediately told Haken to return to the station.

We are not convinced by any of Sparks' arguments challenging his identification. First, Fox's credibility was not seriously in dispute. This was not an unreliable criminal informant, but a complaining victim who had no apparent reason to lie. *See generally*, Wayne R. LaFave, 3 Search & Seizure § 3.4. He had consumed a few beers over the span of several hours, but there is no evidence that he was impaired. Furthermore, Haken verified the physical

evidence of a break-in and the footprint tracks leading to the road. Second, it does not matter that an additional pair of tire tracks entered the road near Ester, nor that Haken initially drove past the service station. Haken noticed that two other cars were on the road in Ester, past the service station, and he quickly determined that both were taxicabs. Furthermore, as soon as Fox identified Sparks kneeling beside the Explorer, Haken turned his car around to investigate.

Based on the totality of the circumstances, we conclude that Officer Haken had probable cause to arrest and to search.

## B.  Fox's Role in the Search

█  Even if Haken had authority to search the car and the duffel bag, Sparks argues that Haken unreasonably exercised that authority when he told Fox to perform the search.[1] The government does not dispute that Fox acted as Haken's agent-and thus as an agent of the state-when he conducted the search. No one argues that this was a private search. *See generally Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Cleaveland*, 38 F.3d 1092, 1093 (9th Cir.1994).

Sparks does not argue that the manner in which Fox conducted the search itself was unreasonable; presumably, if Haken had retrieved and opened the duffel bag, exactly as Fox did, Sparks would not have complained. Instead, Sparks claims that Haken acted unreasonably by delegating

---

1.  The government suggests that this argument was abandoned below. Sparks raised this theory to the magistrate judge during the evidentiary hearing on the motion to suppress. However, the magistrate judge did not respond to the argument in his Report and Recommendation, and Sparks did not then raise the issue to the district court in his Objections to that Report and Recommendation.

We do not agree that the argument was abandoned. Sparks raised the issue to the magistrate judge and engaged him in a colloquy about the theory. We agree with Sparks that, having placed the issue in the record, the district court had the opportunity to consider and decide this claim. Finally, even if the argument had been abandoned, the result is the same because we ultimately hold that the search was reasonable.

to Fox the task of searching. Sparks cites *Tennessee v. Garner,* 471 U.S. 1, 7–8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), for the proposition that the reasonableness of the manner in which a search is conducted is measured for possible abuses of Fourth Amendment rights, even when probable cause to search has been established. He does not cite any authority, however, that precludes the police from delegating authority to conduct a warrantless search to a private citizen. On the other hand, neither does the government cite any authority sanctioning such delegation.

Although no one argues that this was a private search, it is instructive to look at cases that decide whether a search was private or not. *See Coolidge,* 403 U.S. at 487, 91 S.Ct. 2022. Courts have often held that a warrantless search by a civilian is not a private search when police ordered or were complicit in the searches; these "agents" of the state are bound by the Fourth Amendment. *See United States v. Miller,* 688 F.2d 652, 658 (9th Cir.1982) ("[E]ven if Szombathy acted as an instrument of the government, Miller did not suffer an unreasonable, warrantless intrusion into his privacy."); *Commonwealth v. Higgins,* 346 Pa.Super. 238, 499 A.2d 585, 592 (1985) ("Brown's search was state action within the Fourth Amendment, for in conducting it, he did not act as a private individual but as a surrogate of the police. We must therefore decide whether the warrantless search of appellant's truck was justified."). These cases imply that some warrantless searches by private actors acting as government agents are permissible.

■ Many cases have considered the analogous issue of whether a civilian may participate in the execution of a search warrant. *See generally,* Diane Schmauder Kane, Civilian Participation in Execution of Search Warrant as Affecting Legality of Search, 68 A.L.R.5th 549 (1999) (listing cases). In executing a search warrant, government officials must ensure that the search is conducted in a way that minimizes unwarranted intrusions into an individual's privacy. "Where the civilian participating in the execution of a search warrant is the victim of a theft who has been requested by police to point out property that has been stolen from the victim, the courts have unanimously held that the civilian's presence did not affect the propriety of the search." *Id.* § 3(b) (collecting cases); *United States v. Robertson,* 21 F.3d 1030, 1034 (10th Cir.1994) (carjacking victim's presence in defendant's residence was permitted to help identify items covered by warrant); *People v. Superior Court,* 25 Cal.3d 67, 157 Cal.Rptr. 716, 598 P.2d 877, 878 (1979) (participation of burglary victim to identify stolen property was a highly effective technique); *People v. Boyd,* 123 Misc.2d 634, 474 N.Y.S.2d 661, 665 (Sup.Ct.1984) (participation of crime victim is a demonstration of police efficiency and provides a fair method of assuring that the search is not executed in excess). The use of civilians in the execution of federal search warrants is governed by statute. 18 U.S.C. § 3105 ("A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.").

■ Although a neutral magistrate provides protections where a search is pursuant to a warrant, we derive from these cases and section 3105 certain general principles that can be used to test whether a warrantless search by a civilian aiding the police comports with the Fourth Amendment. First, the civilian's role must be to aid the efforts of the police. In other words, civilians cannot be present

simply to further their own goals. *Wilson v. Layne,* 526 U.S. 603, 613–14, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (inviting media to "ride along" on execution of warrant violates the defendant's Fourth Amendment rights). Second, the officer must be in need of assistance. Police cannot invite civilians to perform searches on a whim; there must be some reason why a law enforcement officer cannot himself conduct the search and some reason to believe that postponing the search until an officer is available might raise a safety risk. Third, the civilians must be limited to doing what the police had authority to do. *Coolidge,* 403 U.S. at 487, 91 S.Ct. 2022; *Cleaveland,* 38 F.3d at 1093.

█ Applying these factors to this search, we find that Fox's role in the search of Sparks did not render the search unreasonable. Fox provided direct aid to Haken. Haken testified that he was busy searching Sparks when he ordered Fox to check Sparks' bags. There is no suggestion that Fox was motivated to search at that time by his own goals. Second, Haken was preoccupied with his search of Sparks and testified that he was anxious that the loaded guns be found as quickly as possible. It is true that Haken could have cuffed Sparks, searched him, and put him into his patrol car before he, not Fox, searched the duffel bag. Haken testified that he was worried that the situation could change rapidly given the fact that two strangers remained in the car, near Fox's bags. Haken was without police backup, and it was reasonable that he wanted to focus his attention on the search of Sparks' person. Finally, as we concluded above, Haken had probable cause to search the bags before he instructed Fox to search. Fox searched no more extensively than Haken could have, and Fox stopped searching as soon as the guns were found.

We therefore affirm the district court's denial of Sparks' motion to suppress.

### IV.

Sparks was sentenced by the district court as an Armed Career Criminal. At trial, the district court found that Sparks had three prior convictions that qualified him for application of the ACCA: first degree burglary of a hotel room in Hawaii in 1983; second degree burglary of storage lockers in Anchorage in 1990; and attempted first degree burglary of a building in Anchorage in 1990. Sparks does not challenge the inclusion of the Hawaii burglary in his list of prior convictions. However, he argues that neither of the Anchorage convictions qualifies under the ACCA. Had either prior conviction not qualified, he would have been sentenced in the range of 92–115 months. Instead, because both of the prior Anchorage convictions were counted, Sparks' sentencing range was 168–210 months. Furthermore, the ACCA carries a mandatory minimum sentence of 180 months. The district court sentenced Sparks to the minimum, 180 months.

18 U.S.C. § 924(e) mandates a minimum sentence of fifteen years for defendants with "three previous convictions ... for a violent felony." "Violent felony" is defined as any felony that

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e).

█ In *Taylor v. United States,* 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), the Supreme Court endorsed a "formal categorical approach" for deciding

whether a prior conviction counts as a "violent felony." We are not to hold mini-trials weighing whether each predicate offense actually involved a serious potential risk of injury. We look "only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions." *Id.* at 600, 110 S.Ct. 2143. A conviction counts as a "violent felony" only if the statutory definition of the offense satisfies section 924(e). Generally speaking, if a state's statute defines a crime more broadly than a "violent felony," prior convictions under that statute should not be counted, despite the particular facts underlying those convictions. However, *Taylor* permits the sentencing court to go beyond the mere fact of conviction "in a narrow range of cases" where "the charging paper and jury instructions actually required the jury to find all the elements of [section 924(e)] in order to convict the defendant." *Id.* at 602, 110 S.Ct. 2143.

In 1990, Sparks pled no contest to second degree burglary in Alaska Superior Court and was convicted and sentenced to four years in prison. At sentencing in this case, the prosecution submitted the Judgment and Commitment Order and the Criminal Information from the earlier conviction to the district court. The district court concluded that the burglary counted as a predicate offense under the ACCA.

### A. Statutory Analysis

■ Section 924(e) explicitly defines "violent felony" to include "burglary." In *Taylor*, the Supreme Court held that "Congress meant by 'burglary' [in section 924(e)] the generic sense in which the term is now used in the criminal codes of most States." *Id.* at 598, 110 S.Ct. 2143. The generic sense was defined to contain at least the following elements: "an unlawful or unprivileged entry into, or remaining in, a building or other structure, with in-

tent to commit a crime." *Id.* These elements constitute the baseline definition of generic burglary that we compare against state burglary statutes.

■ Sparks was convicted of burglary for breaking into ten storage lockers in an apartment building. He was not charged with, nor convicted of, breaking into the apartment building itself. Alaska's statute defines burglary more broadly than generic burglary because Alaska's definition of building includes "any propelled vehicle ... adapted ... for carrying on business." Alaska Stat. § 11.81.900(b)(4).

By this language, the Alaska statute includes within the definition of building ordinary theft from automobiles and other vehicles when the vehicle has been adapted for carrying on business. The statute does not define the terms "adapted" and "for carrying on business." Nor have the Alaska courts elucidated the meaning of these terms. Their common-sense meanings are broad, however. An adaption may include any modification. *See* Webster's Ninth New Collegiate Dictionary 55 (1984) (defining adapt as "to make fit (as for a specific or new use or situation) often by modification"). Business also is a broad term. *See id.* at 190 (defining business as "commercial or mercantile activity engaged in as a means of livelihood"). An automobile is easily adapted for business purposes. As but one example, a real estate agent may install a facsimile machine, cellular phone or laptop computer in his or her car to facilitate business. Under the Alaska statute, the theft of a fax machine from a real estate agent's unoccupied automobile might constitute burglary.

Such a definition of burglary is not generic under the MPC or the *Taylor* analysis; nor does it support the purpose of section 924(e). The MPC does not include theft from automobiles within the definition of burglary under any circumstances.

Model Penal Code § 221.1(1). *Taylor* states that statutes that include theft from automobiles within the meaning of burglary are broader than generic burglary: "A few States' burglary statutes ... define burglary more broadly [than generic burglary], *e.g.*, by eliminating the requirement that the entry be unlawful, or by including places, such as automobiles and vending machines, other than buildings." 495 U.S. at 599, 110 S.Ct. 2143. *Taylor* also states that Congress intended to adopt the meaning of burglary used in the criminal codes of most states. *Id.* at 598, 110 S.Ct. 2143. Alaska is one of a minority of states that include theft from vehicles adapted for carrying on business within their definitions of burglary. *See, e.g.,* Ala.Code § 13A–7–1(2); Iowa Code Ann. § 702.12; Mont. Code Ann. § 45–2–101(46); N.J. Stat. Ann. § 2C:18–1; N.Y. Penal Law § 140.00; Or. Rev.Stat. § 164.205; 18 Pa. Cons.Stat. Ann. § 3501; Utah Code. Ann. § 76–6–201; Wash. Rev.Code Ann. § 9A.04.110(5).

The conclusion that the Alaska statute is not generic is consistent with this circuit's decision in *United States v. Sweeten.* 933 F.2d 765 (9th Cir.1991). There, we held that a state statute may include vehicles within the definition of burglary under limited conditions without losing its generic nature. *Id.* at 770–71. We held that burglary of "a structure or vehicle adapted for the overnight accommodation of persons" constitutes the burglary of a "structure" within the generic definition of *Taylor. Id.* at 771. Several factors influenced our decision. We held that only specialized automobiles such as "trailers, campers, and mobile homes—whose primary purpose is to serve as a dwelling and not as a mode of transportation"—would be covered by the definition. *Id.* at 770. We opined that thefts from personal automobiles, with only minor adaptions or modifications, would not be covered by the burglary statute. Second, we noted that

Congress had included burglary in section 924(e) due to "its inherent potential for harm to persons." *Id.* at 771 (quoting *Taylor,* 495 U.S. at 588, 110 S.Ct. 2143). In terms of the potential harm to persons, we found that burglary of vehicles such as mobile homes, campers and trailers "is analogous to the burglary of a building or house." *Id.* at 771.

Applying the *Sweeten* analysis to this case, the Alaska statute exceeds the scope of generic burglary. A vehicle that has been adapted for overnight accommodations has either undergone a fundamental alteration, or originally was designed as a home. In contrast, an automobile or other vehicle may be "adapted ... for carrying on business" through a relatively minor modification, such as installation of a cellular phone or facsimile machine. Such vehicles remain personal automobiles and, unlike trailers, campers, or mobile homes, such vehicles retain as their primary purpose serving as a mode of transportation rather than as an office or other business establishment. They are not analogous to a building, house, or office. Moreover, considerable risk of harm exists with respect to theft from a vehicle in which a person lives or sleeps. The inherent potential for harm to persons resulting from theft of a vehicle adapted for business purposes, however, is no greater than the risk to a person who simply uses his or her car for transportation.

Thus, Alaska's penal code defines a crime that is broader than generic burglary because it reaches thefts from "any propelled vehicle ... adapted ... for carrying on business."

### B. Facts of the Prior Guilty Plea

Because Sparks pled guilty to conduct that fell outside the definition of generic burglary the district court erred in

counting Sparks' prior conviction for entering storage lockers. We do not count a prior conviction as a predicate offense under the ACCA where the conviction was obtained through a guilty plea unless the indictment or information and the guilty plea reveal that the defendant pled guilty to conduct which falls within the generic definition. *Sweeten*, 933 F.2d at 769.

According to the Indictment and Judgment, Sparks pled guilty to "entering storage lockers ... with intent to commit theft." Nowhere in the Indictment is the nature, size, or configuration of these lockers revealed. As Sparks argues, these lockers may have been so small that they could not have housed a person.

■ According to *Taylor*, one of the elements of generic burglary is the entry of a "building or structure." 495 U.S. at 599, 110 S.Ct. 2143. The question is what the Court meant by "building or structure" and whether a small storage locker counts as one.[2] We hold that a prior conviction for "burglary" of storage lockers should not be counted as generic burglary unless the judicially noticeable facts reveal that the lockers were large enough to accommodate a person. This holding is in accord with *Taylor*, as well as consistent with the meaning of burglary "used in the

criminal codes of most States." *Taylor*, 495 U.S. at 598, 110 S.Ct. 2143.

In *Taylor*, the Supreme Court noted that "Congress singled out burglary (as opposed to other frequently committed property crimes such as larceny and auto theft) for inclusion as a predicate offense ... because of its inherent potential for harm to persons. The fact that an offender enters a building to commit a crime often creates the possibility of a violent confrontation between the offender and the occupant, caretaker, or some other person who comes to investigate." *Id.* at 588, 110 S.Ct. 2143. The "inherent potential for harm to persons" is simply not present when the structure that is entered is a small locker. Although some potential for harm may result when a small locker is entered, it is no greater than that involved in a typical property crime such as larceny or automobile theft.[3]

The requirement that a structure be large enough to accommodate a person is supported also by looking to the definition of burglary used by "most States." *Id.* at 598, 110 S.Ct. 2143. The generic definition can be gleaned by looking at statutes, cases, and the Model Penal Code, *see id.* at 598 n. 8, 110 S.Ct. 2143 (referring to the MPC definition to help define the elements of generic burglary). Under the MPC,

---

**2.** Although few cases have looked at whether there is a generic meaning of "building or structure," we have considered a similar issue at least once. In *United States v. Kilgore*, 7 F.3d 854, 856 (9th Cir.1993), we declined to decide whether a statute was too broad to be generic because of its expansive definition of "building." We noted that *Taylor's* use of the terms "building or other structure" was "rather broad" but we moved past the statutory analysis and decided that even if the statute was broad, the defendant committed generic burglary according to facts in the guilty pleas and information. *Id.* at 856.

**3.** The *Taylor* court refused to limit the meaning of "burglary" to the "subclass of burgla-

ries whose elements include 'conduct that presents a serious risk of physical injury to another,' over and above the risk inherent in ordinary burglaries." *Id.* at 597, 110 S.Ct. 2143. Thus, for example, burglaries involving "an unarmed offender, an unoccupied building, and no use of threat or force" still could be within Congress' definition. *Id.* They reasoned, in other words, that even if nobody is inside a structure that is burglarized, the crime itself is still risky. Our holding is consistent with this reasoning; we hold that if nobody *can possibly be* inside a structure that is burglarized, the crime itself is not as risky as burglary, but is instead tantamount to larceny or automobile theft.

only a "building or occupied structure or separately secured or occupied portion thereof" can be burglarized.[4] A small locker is neither a building—at least not within the usual meaning of the word—nor an occupied structure. Many states define "structure" to mean dwelling or an other-wise occupiable space.[5] Other states list various types of rooms, buildings, and ve-hicles that suffice for burglary, none of which can be used to describe a storage locker, and all of which could accommodate a person.[6] Finally, some states apply bur-glary only to buildings and vehicles with-

**4.** Several states appear to adopt the MPC's definition with little or no modification. N.H.Rev.Stat. Ann. § 635:1; N.J. Stat. Ann. §§ 2C:18–1, 2C:18–2; N.D. Cent.Code §§ 12–1–22–02, 12–1–22–06; Ohio Rev.Code Ann. §§ 2909.01, 2911.12; Wyo. Stat. Ann. § 6–3–301.

**5.** Ark.Code Ann. § 5–39–201 ("residential oc-cupiable structure" or "commercial occupia-ble structure"); Conn. Gen.Stat. Ann. §§ 53a–100, 53a–101 (building, which means, in part "structure or vehicle or any building *with a valid certificate of occupancy* " (emphasis add-ed)); Fla. Stat. Ann. § 810.02(4) (third degree burglary requires that there not be "another person in the structure"); Iowa Code Ann. § 713.1 ("an occupied structure"); Ky.Rev. Stat. Ann. §§ 511.010, 511.040 ("any struc-ture vehicle, watercraft or aircraft ... [w]here any person lives; or ... [w]here people as-semble"); Mass. Gen. Laws Ann. ch 266, § 15 ("dwelling house"); Minn.Stat. Ann. §§ 609.581, 609.582 ("structure suitable for affording shelter for human beings including any appurtenant or connected structure"); Mo. Ann. Stat. § 569.170 ("building or inhab-itable structure"); Mont.Code Ann. § 45–6–204 ("building, vehicle, or other place suit-able for human occupancy or night lodging of persons or for carrying on business, whether or not a person is actually present"); N.Y. Penal Law § 140.00 ("structure, vehicle or watercraft used for overnight lodging of per-sons, or used by persons for carrying on busi-ness therein"); N.C. Gen.Stat. § 14–51 ("dwelling house or sleeping apartment" or "curtilage of a dwelling house or in any build-ing not a dwelling house, but in which is a room used as a sleeping apartment"); Or. Rev. Stat §§ 164.215, 164.205 ("booth, vehi-cle, boat, aircraft or other structure adapted for overnight accommodation of persons or for carrying on business therein"); Pa. Cons. Stat. Ann. §§ 3501, 3502 ("structure, vehicle or place adapted for overnight accommoda-tion of persons, or for carrying on business therein"); R.I. Gen. Laws. § 11–8–1 (adopt-ing the common law definition of burglary, which is limited to dwelling houses); Tex. Penal Code Ann. §§ 30.01, 30.02 (applies to habitation—"a structure or vehicle that is adapted for the overnight accommodation of person"—or building—"any enclosed struc-ture intended for use or occupation as a habi-tation or for some purpose of trade, manufac-ture, ornament, or use"); Utah Code Ann. §§ 76–6–201, 76–6–202 ("watercraft, aircraft, trailer, sleeping car, or other structure or vehicle adapted for overnight accommodation of persons or for carrying on business there-in"); Va.Code Ann. § 18.2–89 ("dwelling house"); Wash. Rev.Code § 9A.04.110(5) (2000) ("any structure used for lodging of persons or for carrying on business therein"). Although these examples support our judg-ment that "burglarizing" a structure too small to accommodate a person cannot be generic burglary, we do not hereby hold that such statutes are generic simply because they are defined by occupiability. Rather, a statute that requires occupiability may be neverthe-less broader than generic burglary for some other reason, and a prosecution for burglary of a storage locker under such a statute would be subject to our "judicially noticeable facts" rule set out above.

**6.** Ga.Code Ann. § 16–7–1 ("dwelling house of another or any building, vehicle, railroad car, watercraft, or other such structure designed for use as the dwelling of another"); Md.Code Ann. Crimes & Punishments §§ 28, 32 ("storehouse" defined as a list of room and building types not including any types that would encompass a storage locker); Nev.Rev. Stat. Ann. § 205.060 (list of room and build-ing types); W. Va.Code Ann. §§ 61–3–11, 61–3–12 ("office, shop, storehouse, warehouse, banking house, or any house or building"); Wis. Stat. Ann. § 943.10 ("building or dwell-ing, [several types of vehicles and portions of vehicles], or [a] room within any of the above").

out further definition.[7]  Based on this survey of statutes, in the majority of the states a "structure" must be large enough to accommodate a person.

According to Sparks' indictment and judgment, we know only that he broke into storage lockers.  Because we cannot tell from this record whether these lockers were large enough to accommodate a person, Sparks did not commit generic burglary, and the district court erred when it counted Sparks' prior burglary of ten storage lockers toward his status as an Armed Career Criminal.[8]

## V.

We hold that the district court "counted" at least one of Sparks' prior convictions in error.[9]  Sparks does not qualify as an Armed Career Criminal.  We remand to the district court for resentencing.

We affirm the conviction, but we vacate the sentence and remand for resentencing.

AFFIRMED in part, REVERSED in part, and REMANDED.

7. Ala.Code §§ 13A–7–6, 13A–7–7; Haw.Rev. Stat. § 708–811; Ill. Comp. Stat. Ann. 5/19–1; Tenn.Code Ann. § 39–14–402(a)(3).

8. The government has also argued that, even if storage locker burglary does not satisfy generic burglary, it is a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." See 18 U.S.C. § 924(e)(2)(B)(ii).  We reject this argument as well.  There is nothing inherently risky about the burglary of storage lockers.  Although this particular burglary

ended with Sparks being held at gunpoint by inhabitants of the building, *Taylor* instructs us not to look at the particular facts of the conviction.

9. We express no opinion as to whether "attempted burglary" counts as a prior violent felony when there is no proof that another person was present at the time of attempt.  Because we do not reach this argument, Sparks is free to raise the issue again, if necessary, in a future appeal.