**PUBLISHED**

Filed: September 14, 2009

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARK J. HUNSBERGER; CHERYL A.
HUNSBERGER,

        *Plaintiffs-Appellees,*

v.

J. A. WOOD, Deputy Sheriff,
Botetourt County Sheriff's Office,

        *Defendant-Appellant,*

and

WILLIAM W. BLESSARD; JOHN DOE,

        *Defendants.*

No. 08-1782
(7:07-cv-00087-
SGW-MFU)

## ORDER

In a poll requested by a member of the court on the petition for rehearing en banc, Judges Michael, Motz, King, and Gregory voted to rehear the case en banc. Chief Judge Traxler and Judges Wilkinson, Niemeyer, Shedd, and Duncan voted to deny rehearing en banc. Judge Agee did not participate in the decision of this case. As a majority of participating judges has voted against rehearing en banc and as the panel has voted to deny rehearing, the petition for rehearing and rehearing en banc is hereby denied.

Judge Wilkinson wrote an opinion concurring in the denial of rehearing en banc. Judge Motz wrote an opinion dissenting from the denial of rehearing en banc.

Entered for the court at the direction of Judge Wilkinson.

For the Court

/s/ Patricia S. Connor
Clerk

WILKINSON, Circuit Judge, concurring in the denial of rehearing en banc:

I appreciate the views of my dissenting colleague and add only these words to the panel opinion. *Hunsberger v. Wood*, 570 F.3d 546 (4th Cir. 2009). I believe the panel's judgment to be quite correct and fully consistent with the Supreme Court's often repeated objective of not subjecting officers making difficult discretionary judgments to monetary liability and retrospective relief. *See Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982); *Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009). The cases reiterating this principle are well-known and too numerous to mention, and the almost unparalleled frequency of the principle's iteration by the Court attests not only to its importance to law enforcement but also to its extension of simple fairness to officers who cannot be said to be liable for actions that are found unlawful only by courts splitting hairs in hindsight. *See, e.g.*, *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009); *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Whatever the prong of the *Pearson* inquiry, the ultimate touchstone is one of objective reasonableness. Multiple objective indicators made the officer's judgment a reasonable one here. The presence of Mr. Blessard in plaintiffs' home was solely to aid the officer in finding Blessard's lost and quite possibly endangered stepchild. JA 404, 407. A teenage girl was missing after midnight. JA 1176-77. She was not where

she was supposed to be. JA 363, 368-69, 1308. She did not respond to any of her stepfather's repeated attempts to reach her by cell phone. JA 385, 547. Her stepfather was by all accounts, even the plaintiffs', "worried sick" about his step-daughter. JA 966, 607, 383. The child's car was parked out-side the home of plaintiff (a stranger), blocking the road. JA 369, 1279-80. A home in the immediate neighborhood had recently burned down as the apparent result of unauthorized use. JA 1315-16. There had been two 911 calls about activity at the Hunsberger home. JA 911, 915. A neighbor informed the officers that the Hunsbergers were on vacation. JA 231, 1269. As the officers approached the home, two people fled the darkened premises. JA 149-50. The two officers indicated independently that upon their approach, lights turned off, JA 1284, 1413, and despite repeated rings of the doorbell, no one answered the door, JA 1121, 1176, 1290-91, 1422-23.

While plaintiffs attempt to create a disputed issue of fact as to this last sentence, they do not dispute that two people fled the premises upon the officers' approach. JA 149-50. Nor do they dispute the reasonableness of Sergeant Wood's overall perception that there was suspicious behavior at the Hunsber-ger home, that whoever was inside desperately wished to avoid contact with the police, and that the officer heard strange noises in the garage and a basement door shut and lock upon his approach. JA 1309, 1176-77. However one tries to slice and dice it, any objectively reasonable officer would have been concerned not only for the safety of the Hunsber-gers' property but for the safety of the occupants inside.

Now of course in a situation that unfolded as rapidly as this one did, there will invariably be points of disputed recollec-tion. In fact, the remarkable thing about this case is how little is in dispute, given the run of cases that we have seen where material matters were genuinely at issue. To find liability under these circumstances would simply deal a heavy blow to the capacity of law enforcement to protect persons and prop-erty in situations where perfectly reasonable people would

perceive them to be at real risk. Where protective police activity even to ensure human safety carries heavy monetary consequences and a failure to act carries no penalty at all, *see DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989), it is not difficult to predict that the incentives for inaction will at some point discourage even the most sensible and prudent protective steps.

I repeat that the officer here confronted two different, mutually-reinforcing situations—the need to prevent vandalism and to locate a missing girl before she was seriously harmed. By the time the officer filled out a warrant affidavit and tried to rustle up a magistrate in the wee hours of the morning, it may well have been too late. If we were to hold the officer liable for damages in this situation, we would go far to establishing a broad rule that would prevent police from taking even the most reasonable steps to prevent serious damage to absent homeowners' property and to locate missing minors who might be in situations beyond their capacity to cope.

Plaintiffs seem to suggest that the Fourth Amendment requires a flat rule against the presence of civilians in a home during an officer's search. But a flat rule is not consistent with the reasoning of *Wilson v. Layne*, 526 U.S. 603 (1999). *Wilson* did not establish a blanket rule against the presence of civilians during searches; instead, it made clear that courts must undertake case-by-case inquiries into whether a third party's presence is "related to the objectives of the authorized intrusion." *Id.* at 611. This is far from a flat rule against the presence of civilians, and it is unclear how plaintiffs derive the principle for which they argue.

The flaws of a per se rule against third-party entries become evident when one considers how it would apply in practice. There are innumerable situations where during a home entry an emergency might require the presence of a person who is not a police officer. Firefighters must enter a home

to battle a blaze. *Michigan v. Tyler*, 436 U.S. 499 (1978). Someone who is a doctor or nurse or a lay person who knows how to administer first-aid might provide critical medical services to persons injured in their homes. Explosive experts must enter dwellings to identify and disarm dangerous bombs. Police officers often need property owners to identify their belongings to determine whether they have been stolen. *See, e.g.*, *Bellville v. Town of Northboro*, 375 F.3d 25, 33 (1st Cir. 2004). Bystanders or neighbors sometimes need to assist officers in identifying a victim. Someone who speaks Spanish or any number of languages might be required to translate during the search of a home of someone who does not speak English. These situations are absolutely legion, and cannot all be resolved by some flat rule in advance. Instead, courts must deal with them on a case-by-case basis, evaluating the justification for the presence of the third party in light of the reason for the entry. A per se rule would effectively overrule the *Wilson* case and would prevent police officers from seeking critical help from civilians during searches. In fact, the panel explicitly adopted a narrow holding, tied closely to the facts, to be elaborated only as specific cases and circumstances arise.

The facts which I have recounted above in this case would certainly have suggested to an objectively reasonable officer that this teenage girl was not only missing but possibly hurt and incapacitated. Not to belabor the point, but any parent whose daughter was out after midnight, not answering her cell phone, in a house where she was not supposed to be, in a neighborhood where another residence had only recently burned down, with her car blocking the road, etc. would be alarmed, as plaintiffs admit Blessard was. And any reasonable officer would have tried to help. Even adopting plaintiffs' view that Wood expressly consented to Blessard's presence, as the panel's opinion explicitly did, Wood acted reasonably. It was reasonable for Wood to think that Blessard's presence in the home would be useful. The more quickly Wood could identify NW, the more quickly he could determine whether

she needed assistance. And if she was frightened and hiding in the home, the one thing she might respond to was a parent's reassuring voice. If the missing NW was being held against her will, she might well answer a parent, but not a stranger.

Even to this day, plaintiffs have not suggested any remotely practical course of action Wood should have pursued. Wood could have entered alone and asked any girl he encountered to identify herself. But he had no guarantee of getting an answer, much less a truthful one. He wasn't even sure the missing girl was conscious or hadn't passed out. He could have required any girl who was possibly the missing NW to come outside in the dark after midnight to be identified by Blessard, but such a procedure would be more traumatic to young girls than the one actually used. Further, these alternatives would have been time-consuming, and time was one thing this officer did not have a whole lot of. It's always tempting to go the could-have/should-have route in hindsight, but that is not how the Supreme Court has structured the objective reasonableness inquiry. If a unanimous panel of this court believed upon reflection that Wood's actions were reasonable, how was he to figure otherwise in the fleeting minutes he had? We thankfully know now that NW is safe and that the Hunsberger home was not vandalized or burned to the ground. But no one knew at the time.

For these reasons and those expressed in the panel opinion, I believe en banc review was properly denied.

DIANA GRIBBON MOTZ, Circuit Judge, dissenting from the denial of rehearing *en banc*:

The Fourth Amendment to the Constitution of the United States assures us that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Those words do not contain an idle promise or

advance a novel proposition. Rather, they embody our country's "centuries-old principle of respect for the privacy of the home." *Wilson v. Layne*, 526 U.S. 603, 610 (1999). A panel of this court has abandoned this time-honored promise to hold that a police officer who, without warrant, searches a private home in the middle of the night and allows a civilian to accompany him does not—as a matter of law—violate the Fourth Amendment. *See Hunsberger v. Wood*, 570 F.3d 546 (4th Cir. 2009). With deep regret, I dissent from the full court's refusal to consider this case *en banc*.

I.

On February 2, 2007, a neighbor of Cheryl and Mark Hunsberger called 911 twice—first at ten in the evening and then at midnight—to report cars coming from and going to, and noise coming from, the Hunsberger family home. Because the neighbor had not seen the Hunsbergers for a few days, she believed this activity suspicious. Sergeant J.A. Wood and Deputy Jody Edwards answered both 911 calls.

Responding to the first call, the officers found two cars parked in front of the Hunsberger home; they did not regard this suspicious and so left within five minutes. Responding to the later call, the officers saw an additional car parked in front of the house. Sgt. Wood contends that he saw lights turn off inside the house, and he noticed an open garage door, which had previously been closed. He maintains that he knocked and rang the Hunsbergers' doorbell repeatedly. (Six of the occupants of the Hunsbergers' home testified under oath that they never heard any knock or doorbell. J.A. 67, 288-89, 762, 950, 1437-38, 1486.) Sgt. Wood acknowledges that he did not attempt to telephone the Hunsbergers; instead, he contacted the owners of the three cars parked in front of their house and, speculating that teenagers—probably drinking—had driven them, asked that the cars be retrieved. J.A. 1303-06, 1618, 1626.

In response to Sgt. Wood's call, William Blessard drove to the Hunsbergers' home; he told Sgt. Wood that his stepdaughter, who was supposed to be spending the night elsewhere, had been driving one of the cars. The owners of the other two cars arrived shortly thereafter and drove those cars away without Sgt. Wood or Deputy Edwards questioning them at all. Blessard called his stepdaughter's cell phone, but she did not answer.

Blessard and Sgt. Wood then approached the house, at which point Sgt. Wood claims to have heard "something being knocked over in the garage." Without calling for backup, obtaining a search warrant, or attempting to telephone the Hunsbergers, Sgt. Wood entered and conducted a search of the entire three-story home. Although Sgt. Wood did not find it necessary to ask Deputy Edwards, the other officer on the scene, to accompany him, he did permit Blessard—an untrained civilian—to join him inside the Hunsbergers' home. J.A. 406, 441, 1332-33, 1154-55. In the course of the search (which yielded neither the stepdaughter nor any danger) Sgt. Wood and Blessard questioned the Hunsbergers' sixteen-year-old son and then awakened their ten-year-old daughter. J.A. 432-33, 1343-53. As Sgt. Wood and Blessard pulled her covers down and shined a flashlight in her face, the young girl began screaming. J.A. 950-51, 1486.

The Hunsbergers awoke to their child's screams and discovered two strange men in their home. J.A. 950. Dissatisfied with the explanation that the two men had entered without a warrant to search for Blessard's stepdaughter, the Hunsbergers asked them to leave, which they did.[1] After Sgt. Wood and Blessard finally left, the police apparently engaged in no further search for Blessard's stepdaughter; Blessard explained

---

[1]The Hunsbergers shortly thereafter discovered that their sons had invited friends over; some of those friends (including the stepdaughter) had been drinking and hid in the basement when the police arrived. All of the friends safely returned to their homes that night.

that he did not protest this inaction because, after all, "the law is the law . . . . I mean, do you want to search every house on the block?" J.A. 443.

The Hunsbergers brought this case, maintaining that in entering and searching their home without a warrant and permitting a civilian to participate in this unauthorized entry and search, Sgt. Wood violated their Fourth Amendment right to be free from unreasonable searches. The experienced district judge denied Sgt. Wood's motion for summary judgment. *See Hunsberger v. Wood*, 564 F. Supp. 2d 559, 565-70 (W.D. Va. 2008). A panel of this court reversed, holding as a matter of law that Sgt. Wood's actions did not violate the Constitution. The panel concluded that exigent circumstances not only compelled Sgt. Wood to enter and search a family home without a warrant in the middle of the night, but also allowed him to permit a civilian to accompany him. *See Hunsberger*, 570 F.3d at 555–57.

## II.

The panel's holding permits what the Constitution prohibits. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)) (internal quotation marks omitted). Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972)) (internal quotation marks omitted).

Courts are thus exceedingly reluctant to permit even trained, professional police officers to cross the threshold into a private home. *See, e.g.*, *Georgia v. Randolph*, 547 U.S. 103 (2006); *Mincey v. Arizona*, 437 U.S. 385 (1978); *Silverman*, 365 U.S. 505. Of course, sometimes the sanctity of the home

must yield to public interest; on those rare occasions, the police may enter in order to execute a valid warrant. *See Payton*, 445 U.S. at 586.

But, with "few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo*, 533 U.S. at 31. Exigent circumstances present one of these few exceptions. However, the circumstances must truly be exigent: this exception permits a police officer to "enter a home without a warrant to render *emergency* assistance to an injured occupant or to protect an occupant from *imminent* injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (emphasis added); *see also United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992) ("[T]he [officer] must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.").

As for civilians, even when a warrant sanctions the entry of the police, "it is a violation of the Fourth Amendment for police to bring . . . third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Wilson*, 526 U.S. at 614. When, as here, the police do not obtain a warrant, any search is "circumscribed by the exigencies which justify its initiation." *Horton v. California*, 496 U.S. 128, 139–40 (1990). It is difficult to imagine any exigency that would compel an officer to allow a civilian into a private home, particularly when another trained police officer was at the scene and available to assist in remedying the asserted exigency. In fact, prior to the panel's decision, *no* court had ever held that even truly exigent circumstances authorized a police officer to permit an untrained civilian to participate in the warrantless search of a private home. It seemed settled that police officers "would never let a civilian into a home. . . . That's just not allowed." *Wilson*, 526 U.S. at 624 (Stevens, J.,

concurring and dissenting in part) (quoting the sheriff who supervised the defendant police officers).[2]

### III.

### A.

Although the panel holds Sgt. Wood's warrantless search of the Hunsbergers' home justified as a reasonable response to an emergency, Sgt. Wood's own testimony clearly provides a basis from which a fact finder could conclude that he did *not* respond to an emergency. For Sgt. Wood testified that he never requested backup, J.A. 1310; never asked for assistance from Deputy Edwards, J.A. 1401; never unholstered his weapon, J.A. 1329; and never even attempted to telephone the Hunsbergers, J.A. 1364. The panel either ignores or trivializes these facts. But considering them in the light most favorable to the Hunsbergers (as we must at this stage), at the very least they suggest a dispute as to whether Sgt. Wood had an objectively reasonable belief that an emergency authorized his warrantless entry and search of a private home.[3]

---

[2]In *United States v. Sparks*, 265 F.3d 825 (9th Cir. 2001), *overruled on other grounds by United States v. Grisel*, 488 F.3d 844 (9th Cir. 2007), the court considered whether an officer could allow a civilian to participate in the warrantless search of a *car*. Even in this context, which involves a much less potent privacy interest than a home, *see South Dakota v. Opperman*, 428 U.S. 364, 367 (1976), the court concluded that such civilian involvement was not permitted unless the officer demonstrated that he was "in need of assistance," i.e., that he could not safely summon another officer to help him or conduct the search by himself. *See Sparks*, 265 F.3d at 832. Sgt. Wood, of course, cannot meet even this standard, as he left another officer, Deputy Edwards, outside while he searched the Hunsbergers' home with Blessard.

[3]The concurrence repeatedly notes that "two people fled the darkened premises" as Sgt. Wood approached. This would be relevant, but of course not dispositive, *if* Sgt. Wood saw people fleeing the "premises" prior to the search. But the record contains no evidence that he did; Sgt. Wood certainly did not testify to such a sighting. No matter how compelling the concurrence now finds this fact, it cannot retroactively provide any justifi-

The panel not only ignores these critical facts, it also attempts to draw support for its unprecedented holding from markedly different cases in which officers entered a home to break up a fight, *Stuart*, 547 U.S. at 406; to extinguish a fire, *Michigan v. Tyler*, 436 U.S. 499, 509 (1978); to capture a fleeing, armed suspect, *Warden v. Hayden*, 387 U.S. 294, 298 (1967); or to prevent the imminent destruction of evidence, *Ker v. California*, 374 U.S. 23, 40 (1963). In each of those cases, the officers had actual knowledge of an imminent threat to life, property, or evidence. Sgt. Wood does not even claim to have had such knowledge here. Accordingly, those cases provide no support for the panel's conclusion that exigent circumstances authorized Sgt. Wood's entry and search of the Hunsbergers' home. "To put it simply, a burning building is not the same as an open garage door in terms of the immediacy of threat each presents." *United States v. Bute*, 43 F.3d 531, 538 (10th Cir. 1994).

## B.

The panel follows its exigency ruling with a holding that *Wilson v. Layne*—in which every member of the Supreme Court agreed that the Constitution *did not permit* police, even *when executing a warrant*, to allow third parties to accompany them into a private home—somehow authorized Sgt. Wood, *acting without a warrant*, to *permit* Blessard to enter the Hunsbergers' home. The panel rests this remarkable conclusion on Blessard's ability to identify his stepdaughter, which the panel (after a scant paragraph of analysis, *see Hunsberger*, 570 F.3d at 556-57) finds "related to the objectives of the authorized intrusion." *Id.* at 556 (quoting *Wilson*, 526 U.S. at 611).

---

cation for Sgt. Wood's decision to enter and search the Hunsbergers' home. *See Tennessee v. Garner*, 471 U.S. 1, 26 (1985) (noting that "[t]he clarity of hindsight cannot provide the standard for judging the reasonableness of police decisions").

In doing so, the panel wrenches the *Wilson* language from its context. The sentence from which the panel selectively quotes reads, in its entirety, "[w]hile this does not mean that every police action while inside a home must be explicitly authorized by the text of the warrant, the Fourth Amendment does require that police actions *in execution of a warrant* be related to the objectives of the authorized intrusion." *Wilson*, 526 U.S. at 611 (emphasis added) (citation omitted). Thus, the *Wilson* Court specifically limited its observation to cases in which the police secured a warrant; that, of course, never happened here. Given the disfavor accorded warrantless entries, the panel's failure even to acknowledge the critical difference between this case and *Wilson* is telling—and deeply troubling.

Moreover, the panel ignores the fact that the *Wilson* Court expressly *rejected* the several justifications offered by the defendant police officers as to why the presence of civilians –- in that case, reporters—was "related to" the execution of the warrant. *Id.* at 614. The police in *Wilson* argued that they should have discretion to determine when the presence of reporters would further law enforcement interests, that media ride-alongs facilitate accurate reporting about law enforcement, and that the presence of reporters would curb police misconduct and protect the safety of officers. *Id.* at 612-13. In rejecting these arguments, the Supreme Court established that the phrase "related to the objectives of the authorized intrusion," on which the panel so heavily relies, requires police officers to do more than provide a post-hoc rationalization for allowing a civilian to enter a private home.

Yet the panel's holding that Blessard's presence in the Hunsberger's home was "related to" Sgt. Wood's response to exigency rests on precisely this sort of post-hoc rationalization, namely that Blessard's ability to identify his stepdaughter assisted, and so is "related to," Sgt. Wood's search. Moreover, this rationalization is far weaker than those *rejected* in *Wilson* because the record here contains substantial evidence suggesting that Blessard's "assistance" was nei-

ther necessary nor solicited. Both Blessard and Sgt. Wood, himself, offered testimony from which a fact finder could certainly conclude that Blessard did not enter the Hunsbergers' home to assist Sgt. Wood, and Sgt. Wood did not allow Blessard to join him for this purpose.[4] For example, Blessard swore under oath that when he entered the home, his "sole purpose was to locate [his] step-daughter," that "Sergeant Wood never invited or instructed [him] to enter the home," and that Sgt. Wood never even spoke to him during the search. J.A. 403, 404, 406, 607-08. Rather, Blessard explained, he "just mill[ed] around" the Hunsbergers' home on his own. J.A. 408.

Sgt. Wood similarly testified that at various points during the search, he did not know where Blessard was, J.A. 1331, 1332-33, 1335, 1337-38, and that at no point did he "give[ ] [Blessard] any instruction whatsoever." J.A. 1335. Sgt. Wood explained that it would have been inappropriate for him to request assistance from a civilian except in a serious emergency, "like if you have a riot on the street." J.A. 1403-04. In sum, both men repeatedly acknowledged that Sgt. Wood neither sought nor obtained Blessard's entry into the Hunsber-

---

[4]Even if Sgt. Wood and Blessard had acted in concert, the panel's reasoning would fail because ascertaining a girl's identity would not have helped the police in saving her from imminent harm. If Sgt. Wood had found a girl in the type of distress contemplated by "exigent circumstances"—e.g., seriously ill or injured, or held against her will—the girl's identity would be irrelevant. In *Moss*, 963 F.2d at 679, we rejected a federal officer's contention that obtaining missing campers' identification in order to provide them medical aid justified the officer's entry into an empty cabin. We explained: "That a lost or injured or dead camper was named John Doe rather than Richard Roe was a complete irrelevance to [the officer's] stated concern." *Id.* If Sgt. Wood had found several girls in distress, the panel's logic suggests that rather than help them all, he should have identified Blessard's stepdaughter and singled her out for aid. But, of course, in an emergency, a police officer must assist *any* person in need. Permitting Blessard to enter the Hunsbergers' home was not even loosely "related to" that duty.

gers' home in order to respond to a true emergency.[5] A fact finder could certainly credit their testimony on this point and so reasonably conclude that Sgt. Wood's actions—allowing an untrained, unarmed civilian to mill around a private home, at times unattended—were not "related to" any perceived emergency occurring within the Hunsbergers' home.

Thus, rather than supporting the panel's view, *Wilson* makes it clear that the Fourth Amendment prohibits a civilian's entry into a private home under these circumstances. As we explained in *Buonocore v. Harris*, 65 F.3d 347, 356 (4th Cir. 1995), "the Fourth Amendment prohibits government agents" from "facilitat[ing]" an untrained civilian's search of a private home. (Even Blessard acknowledged this limitation. *See* J.A. 443.)

## IV.

If Sgt. Wood unjustifiably searched the Hunsbergers' home and allowed Blessard to accompany him in this search, as the facts, viewed in the best light for the Hunsbergers, surely indicate, Sgt. Wood clearly violated the Hunsbergers' constitutional rights. Of course, to recover money damages, the

---

[5]The panel cautions against judging Sgt. Wood's actions in hindsight, but based on *what he knew at the time*, Sgt. Wood's decision to allow Blessard into the Hunsbergers' home was not only unconstitutional, but also unwise. Blessard is not a police officer trained to respond to crises as a professional; he is a parent who was "worried sick" about his child. He testified that he was "scared to death" for his stepdaughter's safety as he searched the home. It is sheer luck that when he encountered the Hunsbergers, neither Blessard nor the Hunsbergers—themselves overwrought by the intrusion—attempted to take matters into their own hands. Many parents would not have been so docile, and Sgt. Wood had no way of knowing how Blessard, whom he had just met, would fare in the home. If Sgt. Wood truly believed that Blessard's stepdaughter was in danger, then allowing Blessard to enter the Hunsbergers' home served only to inject uncertainty and volatility into an already tense situation and expose everybody in the house to additional risk. It is the panel that has viewed Sgt. Wood's actions in hindsight in its attempt to rationalize them.

Hunsbergers will have to offer proof as to the harm they have suffered, but they should be given an opportunity to do so. *See Hudson v. Michigan*, 547 U.S. 586, 597-99 (2006) (noting that money damages provide an important remedy for violations of the sanctity of the home).

For, after all, a police officer accompanied by an untrained civilian entered the Hunsbergers' home in the dead of night. These men searched the entire house. They accosted the Hunsbergers' children. If the sanctity of the home is to mean anything, then the police must understand that they cannot use the narrow doctrine of exigency as a crowbar to pry open our homes to unnecessary intrusions.

Justice Kennedy put it well, recently noting that:

> [P]rivacy and security in the home are central to the Fourth Amendment's guarantees as explained in our decisions and as understood since the beginnings of the Republic. This common understanding ensures respect for the law and allegiance to our institutions, and it is an instrument for transmitting our Constitution to later generations undiminished in meaning and force. . . . [I]t is a serious matter if law enforcement officers violate the sanctity of the home by ignoring the requisites of lawful entry. Security must not be subject to erosion by indifference or contempt.

*Hudson*, 547 U.S. at 603 (Kennedy, J., concurring).

The panel's holding works an injustice on the Hunsbergers and creates an unsupportable and unsound precedent. I regret that a majority of my colleagues have not seen fit to correct this affront to the Constitution—and hope that another court will do so.