**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bryan A. MOSS, Defendant–Appellant.**

**No. 90–5222.**

United States Court of Appeals,
Fourth Circuit.

Argued April 12, 1991.

Decided May 1, 1992.

As Amended May 21, 1992.

Brenda G. Brewer, Sylva, N.C., argued, for defendant-appellant.

Thomas Richard Ascik, Asst. U.S. Atty., Asheville, N.C., argued (Thomas J. Ashcraft, U.S. Atty., on brief), for plaintiff-appellee.

Before HALL and PHILLIPS, Circuit Judges, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

PHILLIPS, Circuit Judge:

The issue is whether evidence that a small quantity of marijuana was discovered "in plain view" during a federal officer's warrantless search of a legally-occupied National Forest camper's cabin under the mistaken belief that its occupation was unauthorized should have been suppressed as evidence under the exclusionary rule. We conclude that under the circumstances the warrantless entry for search purposes could only have been justified if the officer had an objectively reasonable belief that an emergency involving danger to person or property required immediate entry, and that no such belief was possible. We further conclude that even had the original entry been justified for the purpose(s) asserted by the officer, the ensuing search of the cabin's interior and its contents had exceeded the bounds of the asserted purpose before the contraband allegedly was discovered "in plain view." We therefore hold, on these alternative grounds, that the search was unconstitutional and the district court's refusal to suppress the evidence was error requiring that the conviction based upon it be vacated.

### I

College students Bryan Moss and Christopher Monroe went during their spring break to the Nantahala National Forest in western North Carolina on a hiking and fishing trip. Through the Forest Service they had reserved the Swan Cabin, which is located in a remote part of the Forest. Upon arriving at the Forest, they registered for the cabin at the ranger station, and then drove to the end of a road where they parked Moss' car and hiked in with their trail bikes, about eight miles, to the cabin. Once at the cabin, Moss and Monroe spent their time hiking and fishing in the area. While they were at the cabin

they always left the door closed but unlocked.

It happened that when Moss had parked his car, he parked it illegally, blocking access to the road. The illegally parked car attracted the attention of Forest Service law enforcement officers. Three days after the car had been parked illegally, Forest Service Officer Riner became involved. First he called a clerk in the Forest Service office to see whether Swan Cabin was reserved and occupied for the week. He did this because it was his experience that sometimes occupants of Swan Cabin parked illegally. The clerk who took the call, however, failed to look in the reservation book, where Moss's name clearly showed that he had reserved the cabin and now occupied it. Instead, she assumed that the cabin was not occupied and so told Officer Riner. Based on this information, Officer Riner set off to find the owner of the car because, according to him, the car had either to be moved or towed, and because he feared the owner might be lost or hurt.[1]

Officer Riner's first stop was at the Swan Cabin, because he figured that the car owner might be there. As he walked up to the cabin, he noticed two things: first, that there was no lock on the door and, second, that there were "fresh bike tracks" in the vicinity of the cabin. According to his testimony, these fresh tracks "kind of" relieved his concern for the "safety" of the car's owner.

Despite this, Officer Riner decided to enter the cabin. In later testimony, he gave three reasons for doing so. First, being under the mistaken impression that no one had reserved the cabin, he thought it had been illegally broken into. Second, he wanted to locate the owner of the illegally parked car in order to have it moved. Third, he was concerned to identify the persons connected with the car, who he

feared might be lost, injured, or dead in the mountains.[2]

Once in the cabin, Officer Riner saw Monroe's wallet, in "plain view." The officer then looked further around the cabin to see if he "could find more identification." He saw a backpack, with an open pocket and with a driver's license in "plain view." He then picked up the driver's license and, according to the officer, at that point he noticed a small bag of marijuana "in plain view" beneath it. He confiscated the marijuana, then looked around for more contraband, and found none.

All of this prompted Officer Riner to radio the Forest Service office to confirm whether Moss and Monroe had in fact reserved the cabin. This time he was told that Moss had indeed reserved the cabin. The officer then did not search for the campers. Instead, he waited for their return.

When Moss returned, he was cited for simple possession under 18 U.S.C. § 844. He also was told that he did not have to move his illegally parked car immediately, but just move it "first thing in the morning."

In the district court, Moss' motion to suppress evidence of the seized marijuana was denied on the express basis that "exigent circumstances existed to justify the warrantless search" and seizure. J.A. 156. Moss then entered a conditional plea of guilty. Sentenced under the Sentencing Guidelines, he received a fine and six months probation. This appeal of the suppression ruling followed.

## II

■ The government seeks first to uphold the district court's ruling on the basis that because Moss had no reasonable expectation of privacy in the cabin, no search within contemplation of the Fourth Amend-

---

**1.** It is established that Officer Riner has search and rescue duties in addition to law enforcement responsibilities.

**2.** He testified that knowing the identification of the person was important to a search since "when you know the identity of the people you

can also find out certain problems that people have.... If [they're], say, epileptic or anything like that. And generally a lot of people carry that with them ... the identification and stuff telling of medical problems or any type of thing like that." J.A. at 79.

ment occurred. *See United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1657–58, 80 L.Ed.2d 85 (1984) ("A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed"); *see also Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (police surveillance of interior of uncovered greenhouse from helicopter not a "search," because no reasonable expectation of privacy as to contents so exposed to overhead view).

So far as appears, this theory was not advanced by the government in the district court. It was not addressed by that court, whose ruling was rested exclusively on the basis that exigent circumstances justified what the court either implicitly found, or assumed, was a "search." *See* J.A. 129–39 (Government's Brief in Opposition to Suppression); J.A. 156 (Order Denying Suppression Motion). The general rule, for very good reasons, is that except in exceptional circumstances, "a federal court does not consider an issue not passed upon below," *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). This appeal presents neither of the circumstances noted in *Singleton* as possibly justifying an exception to the general rule: that "the proper resolution is beyond any doubt," or that "injustice might otherwise result." *Id.* at 121, 96 S.Ct. at 2877–78. Here, as in *Singleton,* injustice would "more likely be caused than avoided" by first instance consideration of such a fact-intensive theory on appeal. *See id.* And the issue surely is not one whose resolution is "beyond any doubt." Indeed, if anything, the arguments in favor of reasonable privacy expectations, hence "search," appear on the evidence of record stronger than those to the contrary advanced by the government on this appeal. Essentially the government seeks to rely on (1) the lack of any physical obstructions to viewing the cabin's interior through its windows from legally occupied positions outside, (2) the relative flimsiness of the cabin's construction, and (3) the failure by Moss to padlock its door, as demonstrating that Moss had no subjective expectation of privacy in its interior which society is prepared to accept

as reasonable. It suffices to point out that if these were generally accepted as disproving the existence of constitutionally protectible privacy interests, the Fourth Amendment's protection against unreasonable searches would be denied to all occupants of flimsily constructed dwellings with unobstructed window or other openings directly on public lands, streets, or sidewalks, who failed to lock their doors to bar entrance. That such indicia could in this case (or generally) demonstrate a lack of constitutionally protected privacy expectations is, at the very least, an issue not subject to resolution "beyond any doubt" on this appeal. We therefore decline to consider it as a theory newly raised.

### III

The government's principal argument (though formally advanced as a fall-back position) is that "evidence of the contraband should be upheld as admissible because of the 'good faith' exception to the exclusionary rule." Government Brief, 21. The exact nature of this theory as then elaborated by the government is not all too clear.

As indicated, the district court's express basis for upholding the search was simply that "exigent circumstances existed to justify [it]." J.A. 156. The nature of the exigency was not identified. The court did not expressly base its decision on the good faith exception now relied on by the government; indeed, it did not mention it. But the court did cite, in support of its ultimate holding that the entry and ensuing search were reasonable, the recent Supreme Court decision in *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). This obviously created a problem for the Government as appellee on this appeal, for, as its brief concedes, *Rodriguez* "is not an exigent circumstances case." Appellee's Brief, 2. Instead, as the Government points out, it dealt with the "good faith exception" to the exclusionary rule: applying it to uphold a warrantless search based on an officer's mistaken, but "good faith," belief that a consenter to the search had authority to

allow it. *Id.* at 23. In consequence, the Government has formally conceded that this is "not an exigent-circumstances case" and does not seek to uphold the search here on that basis. *Id.* at 2. Instead, relying on language in *Rodriguez* which it claims extends the good faith exception to warrantless searches in general, the Government contends that the search here in issue should be upheld on that basis.

Specifically, the contention is that the district court's ruling should be affirmed on the following line of reasoning.[3] Officer Riner believed in "good faith," i.e., reasonably under the circumstances, that the cabin had been broken into, based on reliable information that it had not been reserved. He also believed in "good faith" that the absent occupant or occupants might be or include the owner of the illegally parked automobile, and that one or more might be lost, injured, or dead in the mountains. His decision to enter the cabin therefore was one reasonably based on the dual needs to investigate the scene of a possible criminal activity and to discover the identity and possible medical needs of any of the occupants who might be lost or injured. The initial entry was therefore one which if not warranted on the *actual* facts of the case by any of the recognized exceptions to the warrant requirement, was nevertheless one made on the basis of a reasonable mistake by Officer Riner in believing that a warrantless search was authorized. This is all that *Rodriguez* now requires in order to find a search, whether with or without a warrant, a "reasonable" one not forbidden by the Fourth Amendment. *Id.* at 33.

We must agree that *Rodriguez* implies in clear dicta a wider reach in warrantless search situations for the "good faith" exception than the narrow consensual search situation directly before the Court. The

*Rodriguez* Court specifically identified *exceptions* (in the plural) to the warrant requirement in explaining the reach it was asserting for the "good faith" exception, *see Rodriguez*, 110 S.Ct. at 2800.[4]

But nothing in *Rodriguez* suggests that the good faith exception extends even beyond the generally recognized exceptions to the warrant requirement: i.e., beyond consent, or one of the various forms of exigency that have been recognized depending upon the purpose of a search. That is to say, the mistaken determinations of police officers that may be excused as good faith, reasonable ones, must yet be related to elements of one of these exceptions. The concept remains tied at least to those moorings. It has not been converted into a general license to proceed outside those established constraints, guided only by general notions of reasonableness and good faith in conducting searches and seizures.

We are not sure but that the Government's good faith theory claims more for it than *Rodriguez* allows. In conceding that "this is not an exigent-circumstances case," and banking entirely on a good-faith exception theory, it might appear that the Government is asserting some sort of free-floating "good faith" concept that exists independently of any of the recognized exceptions to the warrant requirement. This, as indicated, would go beyond anything implied in *Rodriguez*, and could not serve as a basis for upholding the search here.

We are not disposed to rest decision on such a reading of the concession and its implications. We assume instead that the Government is asserting a good-faith exception theory that *Rodriguez* contemplates, i.e., one related to one of the recognized exceptions to the warrant requirement. To do so, we interpret the no-exi-

---

3. Unlike the "no-search" theory first sought to be raised on appeal, *see* Part II, the "good faith exception" theory was specifically raised by the Government in the district court. Though it was not (at least expressly) relied upon by the district court in upholding the search, the Government as appellee properly has raised it as an alternative basis for affirming the district court's ruling.

4. And, in support of its holding, the Court cited with approval *Archibald v. Mosel*, 677 F.2d 5 (1st Cir.1982), which had applied the good faith exception in an exigent circumstances situation involving a mistaken belief that a fleeing felon was in certain premises.

gency concession as referring only to those most commonly invoked exigencies that justify warrantless entries and searches of premises either to prevent imminent removal or destruction of evidence, to arrest fleeing criminal suspects, or to avoid imminent threats of death or bodily harm. *See generally* W.L. LaFave, 2 *Search and Seizure* §§ 6.1(f), 6.5(b), 6.5(d) (Second ed. 1987) (hereafter, LaFave). None of these most frequently invoked exigent-circumstances situations is even arguably in play here: there was no cause to believe that immediate entry was required to arrest anyone inside or to protect anyone inside from harm or to avoid the destruction or removal of any evidence of crime. The Government has not made any such claim, and we consider that this is all that properly can be implied from the concession.

The question then arises whether there are other grounds for warrantless entries and searches which might supply the basis for application of *Rodriguez'* extension of the good-faith exception here. The Government has suggested, though obliquely, the most obvious grounds arguably available here: entry to protect property or persons from immediately threatened harm, or to render assistance to persons in need. These are recognized as further exceptions to the warrant requirement. It is on their basis that police may enter premises without warrants for such emergency purposes as aiding in fire-fighting, giving first aid to people in distress, protecting persons or property from threatened harm, and the like. *See generally* 2 LaFave § 6.6; *United States v. Dart,* 747 F.2d 263 (4th Cir. 1984) (warrantless entry into self-storage warehouse units proper where doors visibly forced, in order to protect property, search for burglar); *United States v. Gillenwaters,* 890 F.2d 679 (4th Cir.1989) (warrantless entry proper where police responded to report of stabbing).

The circumstances under which warrantless entries for such purposes can be made are exactly comparable to those which justify warrantless entries under the more commonly encountered "exigencies." Indeed, they are also frequently referred to as "exigent circumstances." *See, e.g.,* *Wayne v. United States,* 318 F.2d 205, 211–12 (D.C.Cir.1963) (plurality opinion) (Burger, J.). This particular exigency is expressed as one of reasonably perceived "emergency" requiring immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions.

To invoke this so-called "emergency doctrine," the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within. *See id.; Root v. Gauper,* 438 F.2d 361 (8th Cir. 1971).

Application of this "emergency doctrine" is subject to another important limitation. Any search following warrantless entry for emergency reasons of the type here described must then be limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry. *United States v. Presler,* 610 F.2d 1206 (4th Cir.1979) (entry to aid unconscious occupant did not warrant unrelated search of apartment); *see also United States v. Brand,* 556 F.2d 1312 (5th Cir. 1977) (proper entry to aid drug overdose victim did not warrant unrelated search of adjacent room, but did make valid discovery of contraband in plain view in victim's room).

For purposes of this case, we assume that the *Rodriguez* extension of the good-faith exception could apply in an emergency doctrine situation. In that setting, it would excuse objectively reasonable mistakes by an officer in determining that an emergency warranting immediate entry and appropriately limited search existed.

Here, we conclude that (1) there was no objectively reasonable basis upon which Riner could have determined that he confronted an emergency requiring immediate entry into the cabin, and that, in any event, (2) there was no objectively reasonable basis upon which he could have believed that accomplishment of the stated purposes of

his entry required making the search that allegedly then disclosed the marijuana "in plain view." We take these in order.

### A

■ Riner's stated purposes in entering the cabin in the first place were essentially two-fold: (1) to verify his assumption that there had been a break-in, and (2) to learn the identity (and special medical needs?) of the persons he assumed were occupying the cabin—in order to render them any assistance needed.

Both of these may be accepted as legitimate concerns of Riner's duties, but there was nothing about the circumstances then confronting him (including his erroneous information) that warranted any perception of an emergency requiring immediate entry to attend to them.

If the cabin was being illegally occupied, there was no indication that any illegal occupant was inside. There was no immediate danger that the cabin itself would be damaged, or that entry into it would prevent that. There was in consequence no objectively reasonable basis upon which it could have been thought necessary immediately to enter the cabin either to verify a suspicion that it was being illegally occupied or to apprehend the culprits.

Neither was there anything in the circumstances confronting Riner that warranted any objectively reasonable perception of an emergency that required immediate identification of the occupants in order to give them assistance—or indeed that assistance was needed. That a lost or injured or dead camper was named John Doe rather than Richard Roe was a complete irrelevance to Riner's stated concern. In fact, the best indication he had of the occupants' likely state of health, mobility, and ability to avoid getting lost were the recent bike tracks which he conceded had already somewhat relieved his mind as to their safety. That no real sense of emergency related to the occupants' safety motivated Riner's search of the cabin is strongly suggested by the fact that after establishing their identity, he did not go looking for them.

We therefore conclude that for neither of Riner's stated purposes in entering the cabin was there an objectively reasonable basis for believing that an emergency required it. The government's reliance on the good-faith exception to uphold the entry and search therefore fails.

### B

■ Even if Riner's original entry were justified under the emergency doctrine, or as the result of a good faith mistake in believing it so justified, his ensuing search was a reasonable one only so far as it furthered his stated purposes for entering. These, to repeat, were only to verify that a break-in had occurred, and to identify the occupants in order to render them any assistance needed. Once those purposes were served, any further warrantless search of the cabin's interior or contents was not authorized, nor was any discovery of items in plain view in the course of such a further search.

To the extent the entry was for the purpose of verifying a break-in, it is hard to see how more than a look from the doorway was needed. The basis for the ingoing assumption was simply that the door was unlocked and the mistaken advice that the cabin had not been reserved. Nothing about the cabin's interior or contents (unless, possibly, evidence of vandalism) was needed to verify the assumption. Indeed, the Government points to nothing in the cabin's search that seems directed at verifying the assumption.

As indicated, we have the gravest doubts (and are not faced with any specific finding to the contrary by the district court) that Riner sought identification of the occupants in order to assist them. Aside from the irrelevance of their exact identities for that purpose, there is Riner's ensuing conduct which completely belies any purpose to search for the occupants once their identities were known.

Even if that purpose be accepted, however, as a basis for emergency entry into the cabin, we are satisfied that it was accomplished for all imaginable purposes

once Riner found Monroe's wallet "in plain view." From that point on, his search of the cabin's interior and of its occupants' personal effects was completely outside the legitimate range of any search justified by this particular "emergency" purpose. In this further foray, on any reasonable view of the matter, Riner was simply rummaging at will through the occupants' personal effects. Even accepting the facially implausible account of his discovery of marijuana "in plain view" under a driver's license in a knapsack, we conclude that at this point, Riner was not legitimately in a position from which he was authorized to discover items "in plain view."

### IV

For the above reasons, we hold that Riner's search and seizure of the marijuana was unconstitutional and that the evidence so seized was not admissible under the good faith exception to the warrant required. Accordingly, we vacate Moss's conviction and remand with directions to suppress the evidence.

SO ORDERED.