PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARK J. HUNSBERGER; CHERYL A.
HUNSBERGER,

    *Plaintiffs-Appellees,*

    v.

J. A. WOOD, Deputy Sheriff,
Botetourt County Sheriff's Office,

    *Defendant-Appellant,*

    and

WILLIAM W. BLESSARD; JOHN DOE,

    *Defendants.*

No. 08-1782

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, District Judge.
(7:07-cv-00087-SGW-MFU)

Argued: May 15, 2009

Decided: June 29, 2009

Before WILKINSON and TRAXLER, Circuit Judges, and
C. Arlen BEAM, Senior Circuit Judge of the United States
Court of Appeals for the Eighth Circuit, sitting by
designation.

---

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Traxler and Senior Judge Beam joined.

## COUNSEL

**ARGUED:** Elizabeth Kay Dillon, GUYNN, MEMMER & DILLON, PC, Salem, Virginia, for Appellant. Melvin Edward Williams, GRIMES & WILLIAMS, PC, Roanoke, Virginia, for Appellees. **ON BRIEF:** Terry N. Grimes, GRIMES & WILLIAMS, PC, Roanoke, Virginia, for Appellees.

## OPINION

WILKINSON, Circuit Judge:

Sergeant J. A. Wood appeals the district court's denial of qualified immunity in this civil suit arising out of Wood's warrantless entry into the plaintiffs' home. Because the objective circumstances confronted by defendant on the night in question suggested that plaintiffs' home was being vandalized and that a missing teenage girl was in the house and in need of assistance, the search was reasonable under the Fourth Amendment exigent circumstances doctrine. We thus reverse the judgment of the district court and grant the defendant qualified immunity in this case.

I.

At 10:17 p.m. on February 2, 2007, a woman named Charlene Klik called 911 to report suspicious activity near her home in Roanoke, which is located in Botetourt County, Virginia. Klik had noticed a number of cars coming and going from the home of her neighbors, Mark and Cheryl Hunsberger. Because the lights in the house were off and she had not seen her neighbors in a couple of days, Klik thought that the Hunsbergers might be on vacation. She saw teenagers getting in and out of the cars in front of the home and became concerned that vandalism or burglary might be taking place.

In response to Klik's 911 call, the Botetourt County Sheriff's Office dispatched Sergeant J. A. Wood and Deputy Sheriff Jody Edwards to the scene. After Edwards briefly spoke to Klik, the two officers observed the home and the surrounding area from their cars for several minutes. The officers saw that some of the lights were on in the house and two cars were parked in front. Seeing and hearing nothing suspicious, they left the scene at approximately 10:37 p.m.

Contrary to Klik's belief, Mark and Cheryl Hunsberger were at home that night, as were their three children: their son Zach, then eighteen years of age; their son LH, then sixteen; and their daughter JH, then ten.[1] Five friends of the two Hunsberger boys were present as well, including NW, a minor girl who was then sixteen. Between 9:00 and 9:30 p.m., the Hunsbergers put JH to bed and then watched television in the garage until approximately 11:00 p.m., when they went to bed.

The teenage children and their friends, who had earlier been at another friend's house, arrived at the Hunsberger home in two cars around 9:00 p.m. The teenagers went to the basement, where they watched television and played card games. Some of them drank beer and vodka. While at the Hunsberger home, several of the teenagers came outside the house at various times to smoke cigarettes and to retrieve items from their cars.

At approximately 11:00 p.m., the mother of one of the friends drove to the house to pick up her daughter; she also gave NW a ride to another friend's home where NW's car was parked. NW then drove back to the Hunsberger home in her own vehicle. Around midnight, Zach and another boy, Aaron Cooper, briefly left to go purchase beer.

---

[1]As was done in the briefs, we have referred to persons under the age of 18 by initials only.

The earlier visit by Edwards and Wood had not allayed Klik's fears, and after seeing additional activity at the house she again called 911 at 12:10 a.m. Edwards and Wood again were dispatched to investigate. While sitting in his vehicle, Wood observed a young man come into the garage, turn on the lights, turn them off again, and reenter the house. Edwards spoke to Klik, who said she was worried about vandalism or burglary at the Hunsberger home, and Edwards relayed Klik's fears to Wood. The officers noticed that a third car, the one driven by NW, was now parked in front of the Hunsberger home. All three cars partially blocked the road.

The officers decided to ask the occupants of the Hunsberger home to move their cars and avoid disturbing the neighbors. They each pulled their cars into the Hunsberger home's driveway, at which point they noticed the lights inside the house turn off. Edwards and Wood exited their vehicles, approached the house, and rang the home's doorbell twenty-five or thirty times. No one came to the door.

Plaintiffs say they never heard the doorbell. The Hunsberger boys and their friends, however, did notice the officers' arrival. When the officers approached the house, Zach and one of his friends, Matt Deane, exited the house through the garage and ran to another friend's home. LH went to his bedroom. NW and two of the other friends hid under the stairwell in the basement.

Walking back to their cars, the two officers noticed that the previously closed side door to the garage, which Zach and Matt Deane had just run through to avoid the officers, was now open. Wood stepped into the garage and knocked on the door inside that led into the house. No one answered. Edwards and Wood returned to their cars.

The officers decided to contact the dispatcher to identify the owners of the vehicles in front of the house using the cars' license plate information. The dispatcher routed calls to each

of the car owners to Wood's cell phone. Wood spoke to several parents including William Blessard, NW's stepfather. Each agreed to pick up his or her respective vehicle.

It struck Wood as suspicious that the occupants of the home had turned off the lights when the officers approached, had refused to answer the door, and had apparently fled the home. Given Klik's claim that the Hunsbergers might be out of town, Wood became concerned about the possibility of vandalism. Wood also took into consideration the fact that two weeks earlier a vacant house nearby had burned down as the apparent result of unauthorized use.

Blessard was the first parent to arrive. Blessard told Wood that NW was supposed to be sleeping over at a friend's house, and that he did not know why her car was at the home of the Hunsbergers, whom he did not know. Blessard called NW's cellphone several times, but she did not answer. He became worried for the welfare of his stepdaughter.

Wood suggested to Blessard that they see if anyone would come to the Hunsberger home's door if they rang the doorbell. Walking towards the front door, they passed the garage, when Wood heard something being knocked over. Wood stepped inside the garage and then heard the door that connected the garage to the house's basement shut and lock. Blessard followed Wood into the garage, walked down the steps to the basement door, knocked repeatedly, and shouted NW's name. No one came to the door, and Blessard's apprehensions rose.

Wood then approached the door inside the garage that opened into the first floor of the home. He discovered it was unlocked. The series of strange happenings had increased Wood's fears of vandalism as well as his concern for the welfare of Blessard's stepdaughter. At that point, Wood decided to enter the home. Wood proceeded into the kitchen area and loudly announced that he was from the sheriff's office and

that anyone in the home who was hiding should reveal himself. Blessard followed Wood into the home.

The lights were off in the home. Using his flashlight, Wood searched the first floor of the home and found no one present. He then went downstairs to the basement and Blessard followed. The two men encountered no one in the basement, but noticed that the television was turned on and saw several cans of beer. Wood and Blessard came back upstairs. Wood made another sweep of the first floor, but again found no one present.

Wood then proceeded up to the second floor, on which there were four bedrooms. As Wood looked in the first bedroom, which was empty, Blessard joined him on the second floor. As Wood entered the next bedroom, a dog walked out of a closet. Wood approached the closet, in which he discovered LH sitting on the floor and wearing only his boxer shorts. Wood says that he asked LH where everyone else was, and that LH said "they are not here." Wood exited the room to check the next bedroom, and LH walked out of the closet and went downstairs.

Wood searched the third bedroom with his flashlight, while Blessard stood by the doorway. Wood discovered JH lying under the covers in bed. JH remembers waking up to someone pointing a flashlight around her room, and that, half-asleep, she told them to leave her alone. Mark Hunsberger and Cheryl Hunsberger say they heard JH scream, which caused them to wake up. LH also says he heard JH scream at some point, but Wood and Blessard do not recall her screaming. JH had the covers pulled over part of her face. Wood approached her bed and pulled the covers down to reveal her face. Wood asked Blessard if the girl was his stepdaughter, and Blessard said no.

Wood checked the rest of the room and then stepped back into the hallway. At that point Mark Hunsberger, having just woken up, exited his bedroom and encountered the two men.

Hunsberger asked Wood why the men were in his house. Wood said that Blessard was looking for NW. Hunsberger said that they should all go downstairs. The three men went into the kitchen on the first floor, and Wood attempted to explain in more detail why he and Blessard had entered the home. Shortly thereafter, Cheryl Hunsberger joined them. She asked for Wood's name and for an explanation of his and Blessard's presence. Mark Hunsberger became very upset with the two men, ordered them to leave, and asked his wife to call the police. Wood and Blessard left the house. The search lasted in total ten or fifteen minutes.

A lieutenant from the Sheriff's office came to the home to take the Hunsbergers' complaint against Wood. After the lieutenant departed, Cheryl Hunsberger called Zach to determine where he was and what had happened. Zach told his mother that several friends, including NW, were hiding in the basement. Upon learning this, Mark Hunsberger went downstairs and discovered NW and two more of his sons' friends. Mark Hunsberger asked his wife to drive NW home immediately, because Blessard was "worried sick" about her. Cheryl Hunsberger dropped NW off at her home.

On February 22, 2007, the Hunsbergers filed the present action in the United States District Court for the Western District of Virginia. Their complaint, twice amended, named Blessard and Wood as defendants and sought money damages under 42 U.S.C. § 1983 and two state law causes of action. Only relevant here is the § 1983 claim against Wood; it alleged that Wood's entry into the Hunsberger home violated the Fourth Amendment's protection against unreasonable searches.

Wood moved for summary judgment. With respect to the § 1983 claim, he argued that the entry into the home was constitutional, and that even if it were not he was entitled to qualified immunity because he violated no bright-line constitutional rule. The district court concluded that Wood's

search of the home was not justified by an emergency, and was therefore unreasonable, and further determined that the constitutional right at issue was clearly established. *Hunsberger v. Wood*, 564 F. Supp. 2d 559, 565-70 (W.D. Va. 2008). Accordingly, the district court denied summary judgment. *Id.* at 570. Wood immediately appealed the district court's ruling. We have jurisdiction over this interlocutory appeal to resolve the purely legal question of whether defendant is entitled to qualified immunity. *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

## II.

Plaintiffs contend that defendant violated their Fourth Amendment rights when he entered their home without a warrant. Because plaintiffs seek money damages, they must overcome defendant's qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendant argues that under Fourth Amendment doctrine, his entry was reasonable under the circumstances and that, even if the entry was unreasonable, he did not violate clearly established federal law. In our review of these purely legal questions, we must reverse the district court's denial of qualified immunity if either of defendant's contentions is correct. As it is within our discretion to choose which of these questions to consider first, *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), we begin by asking whether defendant's conduct violated any constitutional right.

## A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

amend. IV. "At the very core" of this guarantee "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972). Thus, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).

However, this presumption can be overcome. "[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Two exceptions are relevant here.

First, under some circumstances, a police officer can search without a warrant while performing "community caretaking functions." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). In *Dombrowski*, the defendant, a Chicago police officer, was in an automobile accident in Wisconsin. Believing that Chicago policemen were required to carry their service revolvers at all times, local police officers searched the defendant's disabled and towed car in order to find the revolver, as it was standard procedure in their department to remove weapons from vehicles in order "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443. Because the search was a result of a function "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," it was permissible. *Id.* at 441. Although *Dombrowski* involved the search of a vehicle, some lower courts have relied on the community caretaking rationale in upholding warrantless searches of homes. *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006); *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005); *United States v.*

*Rohrig*, 98 F.3d 1506, 1521-22 (6th Cir. 1996). *But see United States v. Bute*, 43 F.3d 531, 535 (10th Cir. 1994) (holding that community caretaking exception applies only to automobile searches); *United States v. Pichany*, 687 F.2d 204, 208-09 (7th Cir. 1982) (same).

Second, even when not performing a community caretaking function, a police officer may search a home without a warrant if, in an emergency, "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). For example, law enforcement officers in hot pursuit of a suspected felon may chase their quarry into a home without seeking judicial authorization. *Warden v. Hayden*, 387 U.S. 294 (1967). They may enter a dwelling to prevent the imminent destruction of evidence. *Ker v. California*, 374 U.S. 23 (1963). Firefighters may enter a burning building to combat a blaze, and may remain for a reasonable time after the fire to investigate its cause and look for evidence of arson. *Michigan v. Tyler*, 436 U.S. 499 (1978). In each of these situations, "there is compelling need for official action and no time to secure a warrant," *id.* at 509, making a warrantless entry reasonable.

Sergeant Wood argues that his entry was justified under both the community caretaking and exigent circumstances doctrines. Analyzing defendant's claim requires us to parse the distinction between the two exceptions to the warrant requirement. The doctrines overlap conceptually. For example, although fire officials investigate arson, the main function they serve is the protection of persons and property, not the detection of crime; thus the *Tyler* exception to the warrant requirement could be justified under a community caretaking rationale, as well as under the exigent circumstances doctrine. Nonetheless, as a doctrinal matter, the two exceptions are not the same. The community caretaking doctrine requires a court

to look at the *function* performed by a police officer, while the emergency exception requires an analysis of the *circumstances* to determine whether an emergency requiring immediate action existed. Thus, as the district court noted, the doctrines have different "intellectual underpinning[s]." *Hunsberger*, 564 F. Supp. 2d at 567.

The parties suggest that *Brigham City v. Stuart*, 547 U.S. 398 (2006), might collapse the distinction between the two doctrines. In upholding a warrantless home entry pursuant to a claimed exigency, the Court in *Stuart* made clear that in general "an action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*,'" support the action. *Id.* at 404 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978). "The officer's subjective motivation is irrelevant." *Id. See also Whren v. United States*, 517 U.S. 806, 813 (1996). This holding initially seems in some tension with *Dombrowski*, which requires a court to determine whether a police officer was engaged in a function "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. at 441. However, the Court in *Stuart* also made clear that "'an inquiry into *programmatic* purpose' is sometimes appropriate." 547 U.S. at 405 (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 46 (2000)). We think the best reading of the relationship between the two exceptions is that when analyzing a search made as the result of a routine police procedure, such as the policy of locating weapons in towed cars in *Dombrowski*, the court should examine the programmatic purpose of the policy—whether it was animated by community caretaking considerations or by law enforcement concerns. But when the search in question was performed by a law enforcement officer responding to an emergency, and not as part of a standardized procedure, the exigent circumstances analysis and its accompanying objective standard should apply.

### B.

Neither party has suggested that Wood, when he entered the Hunsberger home, was following a standard policy that could be classified as community caretaking under the analysis above. A programmatic basis for the officer's actions may exist, but it has not been presented to this court in a fashion that would bring the community caretaker function into play. What community caretaking involves and what boundaries upon it exist have simply not been explained to an extent that would allow us to uphold this warrantless entry based on that justification. This is not to diminish the caretaking function, which may in some cases be of real value to absent homeowners, but only to say that it is in no sense an open-ended grant of discretion that will justify a warrantless search whenever an officer can point to some interest unrelated to the detection of crime.

We must therefore analyze this entry and search under the exigent circumstances doctrine. In this inquiry, we ask whether the circumstances known to Wood would create an "objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). Plaintiffs argue that Wood violated the constitution when he entered the first floor of the Hunsberger home from the garage, so it is the circumstances at that time that are relevant to whether his entry was justified.

We believe that the objective circumstances at the time of Wood's entry would cause a reasonable officer to believe that there was an emergency requiring prompt entry. First, the circumstances indicated the strong possibility of an unauthorized intruder in the home. Klik, the Hunsbergers' neighbor, had said that she thought the Hunsbergers were out of town. There appeared to be someone inside the home who wished to avoid contact with the police; when the officers first arrived, someone in the house turned the lights off, and then later the open

door in the garage suggested that someone had fled the home while the officers were at the front door. Three cars not belonging to the Hunsbergers were parked in front of the house. No one came to the front door when the officers rang the doorbell, and no one answered when Wood and Blessard knocked on the basement door repeatedly. Furthermore, a vacant home in the neighborhood had recently burned down as the apparent result of unauthorized use.

All of these facts gave rise to an objectively reasonable belief that vandalism might be taking place in the home. It is true that police officers need more than a slight suspicion that property is being harmed to justify a warrantless entry. For example, an open door alone does not create a reasonable belief that a burglary is taking place. *Bute*, 43 F.3d at 537-39. But here there were numerous indications to justify the belief that someone was in the Hunsberger home who was not supposed to be there.

Second, there was evidence that a minor girl was in the home, given that her car was parked in front of the house. The girl's stepfather said that she was not supposed to be at the home and was exceedingly concerned for her welfare, especially given that it was the middle of the night. In his deposition testimony, Mark Hunsberger recalled telling his wife that night that Blessard was "worried sick" about his stepdaughter NW. The fact that the girl was not answering her cellphone suggested the possibility that she was hurt or otherwise in need of assistance. When a child goes missing, time is of the essence. It turned out that NW was not in immediate danger, but we cannot judge Wood's search based on what we know in hindsight. At the time of the search, there was reason to think she needed help.

Under these circumstances, a reasonable officer could conclude that prompt entry was necessary in order to protect the Hunsberger home from potential damage and to locate a missing girl who might be in harm's way. This case thus differs

from *United States v. Moss*, 963 F.2d 673 (4th Cir. 1992). There, we held that a forest service officer's search of a cabin that he believed to be illegally occupied was unreasonable where there was "no indication that any illegal occupant was inside" the cabin, "no immediate danger that the cabin itself would be damaged," and nothing suggesting "an emergency that required immediate identification of the occupants in order to give them assistance." *Id.* at 679. Here, the situation could not be more different. The combined exigencies made probable that there was a need for immediate entry, and therefore the officer had an "objectively reasonable perception of an emergency." *Id.*

Plaintiffs argue that Wood should have asked the dispatcher for plaintiffs' home telephone number and attempted to call them before entering. Whether in retrospect this course of action might have been preferable is not dispositive: "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable." *Dombrowski*, 413 U.S. at 447 (internal quotation marks omitted). Plaintiffs also suggest that Wood should have investigated neighbor Klik's credibility, given that her assertion about the Hunsbergers being on vacation was incorrect. But to accept arguments like these would be to put too great a burden on officers tasked with responding to emergencies. There is a danger that in the light of day we can forget that in emergencies, "the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. . . . When policemen, firemen or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous." *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.).

Plaintiffs contend that even if the entry did not violate the Fourth Amendment, the scope of the search was unreason-

able. Because Wood found no evidence of vandalism on the first floor, plaintiffs contend, he should not have descended to the basement or gone up to the second floor. This argument is without merit. The fact that there was no evidence of vandalism in the main living area did not require the conclusion that all was well in the Hunsberger house. Vandals do not confine their search for valuables to downstairs rooms, nor do they rule the upstairs out of bounds for hiding or for inflicting serious harm on others they may happen upon in a house. It is not surprising, therefore, that plaintiffs do not point to precedent for the proposition they seek. Moreover, Wood did not locate the missing NW on the first floor, so that justification for his search remained. Nor did anything he saw on the first floor make clear who had been or remained in the house that night, and thus it was not unreasonable for him to continue searching in order to determine whether an unauthorized person was present. As soon as Wood realized that the Hunsbergers were at home, he ended his search and, after explaining to the homeowners why he had entered, left the house.

Finally, plaintiffs contend that the search was unreasonable because of the presence of Blessard. The parties dispute whether Wood consented to Blessard's presence or Blessard merely followed Wood into the house. Even accepting as true plaintiffs' contention that Wood consented to Blessard's presence, the search was not unreasonable. On this assumption, Blessard was present to help Wood identify NW, Blessard's missing stepdaughter. Thus, unlike *Wilson v. Layne*, 526 U.S. 603 (1999), where the Court held that the presence of reporters made the scope of a search pursuant to a search warrant unreasonable, here the third party's presence was "related to the objectives of the authorized intrusion." *Id.* at 611. Plaintiffs argue that Wood could have asked Blessard to wait outside, and then, if he found a girl matching NW's description, bring her outside so that Blessard could identify her. But, again, simply because plaintiffs can point to a different way that Wood might have pursued his search does not mean that Wood's actual conduct was unreasonable. Wood was

responding to a difficult, evolving, and uncertain situation, and he was attempting to prevent imminent harm to the Hunsbergers' property and to locate the missing NW. It would be reasonable to think that Blessard's presence in the house would be useful if NW were located.[2]

Because we conclude that defendant did not violate the Fourth Amendment, we need not proceed to ask whether the alleged right was clearly established. *Pearson*, 129 S. Ct. at 818. There is a significant overlap between a Fourth Amendment analysis and a qualified immunity inquiry; both are ultimately concerned with reasonableness. Wood's actions were reasonable and he therefore deserves immunity from money damages.

### III.

We do not discount the fear and surprise that plaintiffs no doubt experienced from an unwanted intrusion into their home. But to say that the whole situation was unfortunate is different from saying an officer was objectively unreasonable in acting as he did. To sum up, on the evening in question, the officer knew of two 911 calls from a neighbor complaining of noise and disturbances at the Hunsberger residence and the neighbor's view that the Hunsbergers were not at home. The officer personally observed suspicious behavior and furtive goings and comings upon his approach. In addition, the officer knew of a missing minor after the hour of midnight,

---

[2]Nothing herein is intended to suggest that officers have free license to allow civilians into private homes during searches. Our holding as to Blessard's presence is governed by the specific facts before us, in which a minor girl was missing in the middle of the night, very possibly in the home and in need of assistance. The stepfather entered the home not to assist with any routine police work, but solely to help in identifying his stepdaughter and removing her from a potentially dangerous situation. To be reasonable, the presence of a third party during a search of a home must thus be "related to the justification for police entry," here the identification of a lost and possibly endangered child. *See Wilson*, 526 U.S. at 611.

observed the shaken stepfather worried about his stepdaughter's whereabouts, witnessed the stepfather's repeated inability to contact his stepdaughter notwithstanding the presence of her car outside the home, all in a neighborhood where a vacant house nearby had burned down only recently as the apparent result of unauthorized use. While it is tempting to second-guess an officer's actions, it is also true that real harm to persons and property could result "if police tried to act with the calm deliberation associated with the judicial process." *Wayne*, 318 F.2d at 212. Because defendant's response to the emergency he perceived was objectively reasonable, he is entitled to qualified immunity. The order denying defendant qualified immunity is reversed, and the case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*