DIANA GRIBBON MOTZ, Circuit Judge,
dissenting from the denial of rehearing en banc:
The Fourth Amendment to the Constitution of the United States assures us that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.” U.S. Const, amend. IV. Those words do not contain an idle promise or advance a novel proposition. Rather, they embody our country’s “centuries-old principle of respect for the privacy of the home.” Wilson v. Layne, 526 U.S. 603, 610, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). A panel of this court has abandoned this time-honored promise to hold that a police officer who, without warrant, searches a private home in the middle of the night and allows a civilian to *223 accompany him does not — as a matter of law — violate the Fourth Amendment. See Hunsberger v. Wood, 570 F.3d 546 (4th Cir.2009). With deep regret, I dissent from the full court’s refusal to consider this case en banc.
I.
On February 2, 2007, a neighbor of Cheryl and Mark Hunsberger called 911 twice — first at ten in the evening and then at midnight — to report cars coming from and going to, and noise coming from, the Hunsberger family home. Because the neighbor had not seen the Hunsbergers for a few days, she believed this activity suspicious. Sergeant J.A. Wood and Deputy Jody Edwards answered both 911 calls.
Responding to the first call, the officers found two cars parked in front of the Hunsberger home; they did not regard this suspicious and so left within five minutes. Responding to the later call, the officers saw an additional car parked in front of the house. Sgt. Wood contends that he saw lights turn off inside the house, and he noticed an open garage door, which had previously been closed. He maintains that he knocked and rang the Hunsbergers’ doorbell repeatedly. (Six of the occupants of the Hunsbergers’ home testified under oath that they never heard any knock or doorbell. J.A. 67, 288-89, 762, 950, 1437-38, 1486.) Sgt. Wood acknowledges that he did not attempt to telephone the Hunsbergers; instead, he contacted the owners of the three cars parked in front of their house and, speculating that teenagers — probably drinking — had driven them, asked that the cars be retrieved. J.A. 1303-06, 1618, 1626.
in response to Sgt. Wood’s call, William Blessard drove to the Hunsbergers’ home; he told Sgt. Wood that his stepdaughter, who was supposed to be spending the night elsewhere, had been driving one of the cars. The owners of the other two cars arrived shortly thereafter and drove those cars away without Sgt. Wood or Deputy Edwards questioning them at all. Blessard called his stepdaughter’s cell phone, but she did not answer.
Blessard and Sgt. Wood then approached the house, at which point Sgt. Wood claims to have heard “something being knocked over in the garage.” Without calling for backup, obtaining a search warrant, or attempting to telephone the Hunsbergers, Sgt. Wood entered and conducted a search of the entire three-story home. Although Sgt. Wood did not find it necessary to ask Deputy Edwards, the other officer on the scene, to accompany him, he did permit Blessard — an untrained civilian — to join him inside the Hunsbergers’ home. J.A. 406, 441, 1332-33, 1154-55. In the course of the search (which yielded neither the stepdaughter nor any danger) Sgt. Wood and Blessard questioned the Hunsbergers’ sixteen-year-old son and then awakened their ten-year-old daughter. J.A. 432-33, 1343-53. As Sgt. Wood and Blessard pulled her covers down and shined a flashlight in her face, the young girl began screaming. J.A. 950-51, 1486.
The Hunsbergers awoke to their child’s screams and discovered two strange men in their home. J.A. 950. Dissatisfied with the explanation that the two men had entered without a warrant to search for Blessard’s stepdaughter, the Hunsbergers asked them to leave, which they did.[1] Af *224 ter Sgt. Wood and Blessard finally left, the police apparently engaged in no further search for Blessard’s stepdaughter; Blessard explained that he did not protest this inaction because, after all, “the law is the law.... I mean, do you want to search every house on the block?” J.A. 443.
The Hunsbergers brought this case, maintaining that in entering and searching their home without a warrant and permitting a civilian to participate in this unauthorized entry and search, Sgt. Wood violated their Fourth Amendment right to be free from unreasonable searches. The experienced district judge denied Sgt. Wood’s motion for summary judgment. See Hunsberger v. Wood, 564 F.Supp.2d 559, 565-70 (W.D.Va.2008). A panel of this court reversed, holding as a matter of law that Sgt. Wood’s actions did not violate the Constitution. The panel concluded that exigent circumstances not only compelled Sgt. Wood to enter and search a family home without a warrant in the middle of the night, but also allowed him to permit a civilian to accompany him. See Hunsberger, 570 F.3d at 555-57.
II.
The panel’s holding permits what the Constitution prohibits. “At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.” Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)) (internal quotation marks omitted). Indeed, “physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.” Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting United States v. United States Disk Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)) (internal quotation marks omitted).
Courts are thus exceedingly reluctant to permit even trained, professional police officers to cross the threshold into a private home. See, e.g., Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006); Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); Silverman, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734. Of course, sometimes the sanctity of the home must yield to public interest; on those rare occasions, the police may enter in order to execute a valid warrant. See Payton, 445 U.S. at 586, 100 S.Ct. 1371.
But, with “few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no.” Kyllo, 533 U.S. at 31, 121 S.Ct. 2038. Exigent circumstances present one of these few exceptions. However, the circumstances must truly be exigent: this exception permits a police officer to “enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.” Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (emphasis added); see also United States v. Moss, 963 F.2d 673, 678 (4th Cir.1992) (“[T]he [officer] must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.”).
As for civilians, even when a warrant sanctions the entry of the police, “it is a violation of the Fourth Amendment for police to bring ... third parties into a home during the execution of a warrant when the presence of the third parties in *225 the home was not in aid of the execution of the warrant.” Wilson, 526 U.S. at 614, 119 S.Ct. 1692. When, as here, the police do not obtain a warrant, any search is “circumscribed by the exigencies which justify its initiation.” Horton v. California, 496 U.S. 128, 139-40, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). It is difficult to imagine any exigency that would compel an officer to allow a civilian into a private home, particularly when another trained police officer was at the scene and available to assist in remedying the asserted exigency. In fact, prior to the panel’s decision, no court had ever held that even truly exigent circumstances authorized a police officer to permit an untrained civilian to participate in the warrantless search of a private home. It seemed settled that police officers “would never let a civilian into a home .... That’s just not allowed.” Wilson, 526 U.S. at 624, 119 S.Ct. 1692 (Stevens, J., concurring and dissenting in part) (quoting the sheriff who supervised the defendant police officers).[2]
III.
A.
Although the panel holds Sgt. Wood’s warrantless search of the Hunsbergers’ home justified as a reasonable response to an emergency, Sgt. Wood’s own testimony clearly provides a basis from which a fact finder could conclude that he did not respond to an emergency. For Sgt. Wood testified that he never requested backup, J.A. 1310; never asked for assistance from Deputy Edwards, J.A. 1401; never unholstered his weapon, J.A. 1329; and never even attempted to telephone the Hunsbergers, J.A. 1364. The panel either ignores or trivializes these facts. But considering them in the light most favorable to the Hunsbergers (as we must at this stage), at the very least they suggest a dispute as to whether Sgt. Wood had an objectively reasonable belief that an emergency authorized his warrantless entry and search of a private home.[3]
The panel not only ignores these critical facts, it also attempts to draw support for its unprecedented holding from markedly different cases in which officers entered a home to break up a fight, Stuart, 547 U.S. at 406, 126 S.Ct. 1943; to extinguish a fire, Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); to capture a fleeing, armed suspect, Warden v. *226 Hayden, 387 U.S. 294, 298, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); or to prevent the imminent destruction of evidence, Ker v. California, 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). In each of those cases, the officers had actual knowledge of an imminent threat to life, property, or evidence. Sgt. Wood does not even claim to have had such knowledge here. Accordingly, those cases provide no support for the panel’s conclusion that exigent circumstances authorized Sgt. Wood’s entry and search of the Hunsbergers’ home. “To put it simply, a burning building is not the same as an open garage door in terms of the immediacy of threat each presents.” United States v. Bute, 43 F.3d 531, 538 (10th Cir.1994).
B.
The panel follows its exigency ruling with a holding that Wilson v. Layne — in which every member of the Supreme Court agreed that the Constitution did not permit police, even when executing a warrant, to allow third parties to accompany them into a private home' — somehow authorized Sgt. Wood, acting without a warrant, to permit Blessard to enter the Hunsbergers’ home. The panel rests this remarkable conclusion on Blessard’s ability to identify his stepdaughter, which the panel (after a scant paragraph of analysis, see Hunsberger, 570 F.3d at 556-57) finds “related to the objectives of the authorized intrusion.” Id. at 556 (quoting Wilson, 526 U.S. at 611, 119 S.Ct. 1692).
In doing so, the panel wrenches the Wilson language from its context. The sentence from which the panel selectively quotes reads, in its entirety, “[wjhile this does not mean that every police action while inside a home must be explicitly authorized by the text of the warrant, the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion.” Wilson, 526 U.S. at 611, 119 S.Ct. 1692 (emphasis added) (citation omitted). Thus, the Wilson Court specifically limited its observation to cases in which the police secured a warrant; that, of course, never happened here. Given the disfavor accorded warrantless entries, the panel’s failure even to acknowledge the critical difference between this case and Wilson is telling — and deeply troubling.
Moreover, the panel ignores the fact that the Wilson Court expressly rejected the several justifications offered by the defendant police officers as to why the presence of civilians — in that case, reporters — was “related to” the execution of the warrant. Id. at 614, 119 S.Ct. 1692. The police in Wilson argued that they should have discretion to determine when the presence of reporters would further law enforcement interests, that media ridealongs facilitate accurate reporting about law enforcement, and that the presence of reporters would curb police misconduct and protect the safety of officers. Id. at 612-13, 119 S.Ct. 1692. In rejecting these arguments, the Supreme Court established that the phrase “related to the objectives of the authorized intrusion,” on which the panel so heavily relies, requires police officers to do more than provide a post-hoc rationalization for allowing a civilian to enter a private home.
Yet the panel’s holding that Blessard’s presence in the Hunsberger’s home was “related to” Sgt. Wood’s response to exigency rests on precisely this sort of posthoc rationalization, namely that Blessard’s ability to identify his stepdaughter assisted, and so is “related to,” Sgt. Wood’s search. Moreover, this rationalization is far weaker than those rejected in Wilson because the record here contains substantial evidence suggesting that Blessard’s “assistance” was neither necessary nor so *227 licited. Both Blessard and Sgt. Wood, himself, offered testimony from which a fact finder could certainly conclude that Blessard did not enter the Hunsbergers’ home to assist Sgt. Wood, and Sgt. Wood did not allow Blessard to join him for this purpose.[4] For example, Blessard swore under oath that when he entered the home, his “sole purpose was to locate [his] step-daughter,” that “Sergeant Wood never invited or instructed [him] to enter the home,” and that Sgt. Wood never even spoke to him during the search. J.A. 403, 404, 406, 607-08. Rather, Blessard explained, he “just mill[ed] around” the Hunsbergers’ home on his own. J.A. 408.
Sgt. Wood similarly testified that at various points during the search, he did not know where Blessard was, J.A. 1331, 1332-33, 1335, 1337-38, and that at no point did he “give[ ] [Blessard] any instruction whatsoever.” J.A. 1335. Sgt. Wood explained that it would have been inappropriate for him to request assistance from a civilian except in a serious emergency, “like if you have a riot on the street.” J.A. 1403-04. In sum, both men repeatedly acknowledged that Sgt. Wood neither sought nor obtained Blessard’s entry into the Hunsbergers’ home in order to respond to a true emergency.[5] A fact finder could certainly credit their testimony on this point and so reasonably conclude that Sgt. Wood’s actions — allowing an untrained, unarmed civilian to mill around a private home, at times unattended — were not “related to” any perceived emergency occurring within the Hunsbergers’ home.
Thus, rather than supporting the panel’s view, Wilson makes it clear that the Fourth Amendment prohibits a civilian’s entry into a private home under these circumstances. As we explained in Buonocore v. Harris, 65 F.3d 347, 356 (4th Cir. 1995), “the Fourth Amendment prohibits government agents” from “facilitating]” an untrained civilian’s search of a private *228 home. (Even Blessard acknowledged this limitation. See J.A. 443.)
IV.
If Sgt. Wood unjustifiably searched the Hunsbergers’ home and allowed Blessard to accompany him in this search, as the facts, viewed in the best light for the Hunsbergers, surely indicate, Sgt. Wood clearly violated the Hunsbergers’ constitutional rights. Of course, to recover money damages, the Hunsbergers will have to offer proof as to the harm they have suffered, but they should be given an opportunity to do so. See Hudson v. Michigan, 547 U.S. 586, 597-99, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (noting that money damages provide an important remedy for violations of the sanctity of the home).
For, after all, a police officer accompanied by an untrained civilian entered the Hunsbergers’ home in the dead of night. These men searched the entire house. They accosted the Hunsbergers’ children. If the sanctity of the home is to mean anything, then the police must understand that they cannot use the narrow doctrine of exigency as a crowbar to pry open our homes to unnecessary intrusions.
Justice Kennedy put it well, recently noting that:
[Pjrivacy and security in the home are central to the Fourth Amendment’s guarantees as explained in our decisions and as understood since the beginnings of the Republic. This common understanding ensures respect for the law and allegiance to our institutions, and it is an instrument for transmitting our Constitution to later generations undiminished in meaning and force.... [I]t is a serious matter if law enforcement officers violate the sanctity of the home by ignoring the requisites of lawful entry. Security must not be subject to erosion by indifference or contempt.
Hudson, 547 U.S. at 603, 126 S.Ct. 2159 (Kennedy, J., concurring).
The panel’s holding works an injustice on the Hunsbergers and creates an unsupportable and unsound precedent. I regret that a majority of my colleagues have not seen fit to correct this affront to the Constitution — -and hope that another court will do so.

. The Hunsbergers shortly thereafter discovered that their sons had invited friends over; some of those friends (including the stepdaughter) had been drinking and hid in the basement when the police arrived. All of the *224 friends safely returned to their homes that night.

. In United States v. Sparks, 265 F.3d 825 (9th Cir.2001), overruled on other grounds by United States v. Grisel, 488 F.3d 844 (9th Cir. 2007), the court considered whether an officer could allow a civilian to participate in the warrantless search of a car. Even in this context, which involves a much less potent privacy interest than a home, see South Dakota v. Opperman, 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the court concluded that such civilian involvement was not permitted unless the officer demonstrated that he was "in need of assistance,” i.e., that he could not safely summon another officer to help him or conduct the search by himself. See Sparks, 265 F.3d at 832. Sgt. Wood, of course, cannot meet even this standard, as he left another officer, Deputy Edwards, outside while he searched the Hunsbergers’ home with Blessard.

. The concurrence repeatedly notes that "two people fled the darkened premises” as Sgt. Wood approached. This would be relevant, but of course not dispositive, if Sgt. Wood saw people fleeing the "premises” prior to the search. But the record contains no evidence that he did; Sgt. Wood certainly did not testify to such a sighting. No matter how compelling the concurrence now finds this fact, it cannot retroactively provide any justification for Sgt. Wood’s decision to enter and search the Hunsbergers’ home. See Tennessee v. Garner, 471 U.S. 1, 26, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (noting that ”[t]he clarity of hindsight cannot provide the standard for judging the reasonableness of police decisions”).

. Even if Sgt. Wood and Blessard had acted in concert, the panel’s reasoning would fail because ascertaining a girl’s identity would not have helped the police in saving her from imminent harm. If Sgt. Wood had found a girl in the type of distress contemplated by "exigent circumstances” — e.g., seriously ill or injured, or held against her will — the girl's identity would be irrelevant. In Moss, 963 F.2d at 679, we rejected a federal officer’s contention that obtaining missing campers' identification in order to provide them medical aid justified the officer's entry into an empty cabin. We explained: "That a lost or injured or dead camper was named John Doe rather than Richard Roe was a complete irrelevance to [the officer’s] stated concern.” Id. If Sgt. Wood had found several girls in distress, the panel’s logic suggests that rather than help them all, he should have identified Blessard’s stepdaughter and singled her out for aid. But, of course, in an emergency, a police officer must assist any person in need. Permitting Blessard to enter the Hunsbergers’ home was not even loosely "related to” that duty.

. The panel cautions against judging Sgt. Wood’s actions in hindsight, but based on what he knew at the time, Sgt. Wood’s decision to allow Blessard into the Hunsbergers' home was not only unconstitutional, but also unwise. Blessard is not a police officer trained to respond to crises as a professional; he is a parent who was "worried sick” about his child. He testified that he was “scared to death” for his stepdaughter's safety as he searched the home. It is sheer luck that when he encountered the Hunsbergers, neither Blessard nor the Hunsbergers — themselves overwrought by the intrusion — attempted to take matters into their own hands. Many parents would not have been so docile, and Sgt. Wood had no way of knowing how Blessard, whom he had just met, would fare in the home. If Sgt. Wood truly believed that Blessard’s stepdaughter was in danger, then allowing Blessard to enter the Hunsbergers’ home served only to inject uncertainty and volatility into an already tense situation and expose everybody in the house to additional risk. It is the panel that has viewed Sgt. Wood’s actions in hindsight in its attempt to rationalize them.